# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

NATIONAL PARKS CONSERVATION
ASSOCIATION
777 6th Street, N.W.
Washington, D.C. 20001-3723,
                                        Plaintiff,

    v.

DEPARTMENT OF THE INTERIOR
1849 C Street N.W.
Washington, D.C. 20240,

NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240,

MARGARET EVERSON,
In her official capacity as Acting Director of the
National Park Service
1849 C Street, N.W.
Washington, D.C. 20240, and

DAVID BERNHARDT,
In his official capacity as Secretary of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

                                        Defendants.

Case No. 20-3706

# COMPLAINT UNDER ADMINISTRATIVE PROCEDURE
# ACT AND FREEDOM OF INFORMATION ACT

## INTRODUCTION

1.    Biscayne National Park (the "Park") is the largest marine park in the National

Park System, located in the South Florida ecosystem.  The Park is recognized for its significant

coral reef system, its estuarine bay, and its largely undeveloped mangrove shoreline.  The Park

preserves geographically unique and noteworthy assemblages of tropical and subtropical flora and unique marine habitat and nursery environments that sustain diverse and abundant native fishery resources.  The Secretary of the Department of the Interior, acting through the National Park Service ("NPS"), is charged by Congress with managing the Park.

2.      In 2014 and 2015, after years of study, consultations with State agencies, public input and review under the National Environmental Policy Act ("NEPA"), NPS determined that the Park's coral reef ecosystems had been in continuous decline for a number of years, in large part due to fishing pressure and the grounding of ships, and that the Park's fishery resources are "extremely stressed and need special attention."  NPS therefore determined in 2015 to establish a marine reserve zone ("MRZ") "as soon as practicable" where no fishing would be allowed, identifying the specific location and restrictions to be applied there.  In addition, in 2014, NPS determined to allow existing commercial fishing to continue, but to phase it out in part of the Park over time.  NPS then drafted regulations implementing that decision, without which current regulations prohibit commercial fishing in the Park.

3.      In the many years since making those decisions in Records of Decision under NEPA, however, NPS has neither implemented the MRZ nor adopted the commercial fishing regulations NPS had decided to adopt.  Meanwhile, the Park's coral reef ecosystem and its fisheries have continued to deteriorate.  In 2020, moreover, NPS entered into a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission ("FWC") in which NPS agreed to continue commercial fishing rather than phasing it out and not to implement either of these decisions if less restrictive measures would suffice, meaning that NPS agreed at least to delay implementation of those decisions for many more years and perhaps forever.

2

4.       Plaintiff National Parks Conservation Association ("NPCA") brings the First and Second Claims for Relief asserted here under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* ("APA") asking the Court to find that the Secretary of the Interior and NPS have acted arbitrarily and capriciously, in an abuse of discretion and not in accordance with law by taking and failing to take and unreasonably delaying  actions to implement the decision made long ago to implement the MRZ and to phase out commercial fishing.

5.       On information and belief, the failure to implement those decisions was the result of actions or inactions by officials at the Department of the Interior and the NPS Headquarters in Washington, D.C.  In April 2020, Plaintiff NPCA filed a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") with that Headquarters seeking documents related to these issues.  See copy, Attachment A hereto.  At this time, however, NPS has produced no documents under that request and has not officially responded thereto.  NPCA therefore brings this action asking the Court to compel such production.

**THE PARTIES**

6.       Plaintiff NPCA is a 501(c)(3) non-profit organization whose mission is to enhance and protect the National Park System and its now 422 component units.  NPCA has almost 1.4 million members and supporters who love the National Park System.  These members visit the National Parks' component units and derive great inspiration and pleasure from them, whether while visiting them or while admiring them from afar.  Formed in 1919, only three years after establishment of the National Park System and NPS, NPCA has been a major factor in helping to shape and grow the National Park System.  NPCA is headquartered in Washington, D.C. and has various regional and field offices around the country, including a Sun Coast Regional Office based in Hollywood, Florida.  That office, among other activities, works to protect and defend the fragile coral reefs and vital fisheries at the Park.

7.      The Department of the Interior is an agency of the U.S. Government and is headquartered at 1849 C Street, N.W., Washington, D.C.

8.      Defendant David L. Bernhardt is Secretary of the Interior and, as such, he is entrusted by Congress with the management of the National Park System, acting through the Director of NPS.  *See* 54 U.S.C. § 100101(a).  His office is located at 1849 C Street, N.W., Washington, D.C.

9.      Defendant NPS is a bureau of the Department of the Interior which manages the National Park System.  NPS is the agency that made the decisions at issue here.

10.     Defendant Margaret Everson is the Acting Director of NPS.  As such, acting under the Secretary of the Interior, she is entrusted with management of the National Park System.  Her office is located at 1849 C Street, N.W., Washington, D.C.  Since the beginning of the Trump Administration, there has been no Director of NPS confirmed by the U.S. Senate.

## JURISDICTION

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under the APA, which grants the Court authority to review agency actions, failures to act and unreasonable delays in acting that violate other federal laws and regulations and/or which were arbitrary and capricious or an abuse of discretion.

12.     This Court has jurisdiction over Plaintiff's FOIA claim pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 552(a)(4)(B) (FOIA).

## VENUE

13.     Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants Department of the Interior and NPS and Plaintiff NPCA reside in this District, and because a substantial part of the events and omissions giving rise to Plaintiff's legal claims transpired in this District.  Venue is also proper pursuant to 5 U.S.C. § 552(a)(4)(B), because

portions or all of the records responsive to NPCA's FOIA request at issue here are situated in

this district, and because venue will lie in the District for the District of Columbia for any FOIA

case under that section.

## LEGAL FRAMEWORK

### National Park Service Organic Act

14.     Under the National Park System "Organic Act", which created the National Park

System and NPS in 1916, Defendants were charged with the duty to:

> promote and regulate the use of the National Park System by means and measures
> that conform to the fundamental purpose of the System units, which purpose is to
> conserve the scenery, natural and historic objects, and wild life in the System units
> and to provide for the enjoyment of the scenery, natural and historic objects, and
> wild life in such manner and by such means as will leave them unimpaired for the
> enjoyment of future generations.

54 U.S.C. § 100101(a).  NPS is accordingly mandated not to take any action that would "impair"

the resources or values of the National Park System.  NPS has adopted official interpretations of

what it called "[t]he key management-related provision" of the Act.  NPS Management Policies

2006 ("Management Policies") § 1.4.1, https://www.nps.gov/policy/MP_2006.pdf (also stating

that Section 1.4 "represents the agency's interpretation of these key statutory provision").

15.     Section 1.4.4 of the Management Policies states that the "cornerstone" of the

Organic Act provides that NPS's discretion in the management of the National Parks is "limited

by the statutory requirement (generally enforceable by federal courts) that the Park Service must

leave park resources and values unimpaired unless a particular law directly and specifically

provides otherwise."  Section 1.4.5 defines "impairment" as "an impact that, in the professional

judgment of the responsible NPS manager, would harm the integrity of park resources or

values."  Whether an impact would be an impairment "depends on the particular resources and

values that would be affected; the severity, duration, and timing of the impact; the direct and

indirect effects of the impact; and the cumulative effects of the impact in question and other

impacts."   Management Policies § 1.4.5.  An impact "would be more likely to constitute an

impairment to the extent that it affects a resource or value whose conservation is … necessary to

fulfill specific purposes identified in the establishing legislation …, or key to the natural or

cultural integrity of the park or to opportunities to enjoy the park …." *Id.*

16.      In 1978, Congress went further, reinforcing the mandate for preservation of those

resources and values.  Congress provided that the "the protection, management, and

administration of the System units shall be conducted in light of the high public value and

integrity of the System and shall not be exercised in derogation of the values and purposes for

which the System units have been established, *except as directly and specifically provided by

Congress.*"  54 U.S.C. § 100101(b)(2) (emphasis added).  NPS and the courts have interpreted

the 1970s Organic Act amendments as directing NPS "to manage all units of the park system so

as to effect the purpose of the Organic Act — primarily resource protection."  *Bicycle Trails

Council of Marin v. Babbitt*, 82 F.3d 1445, 1451–52 (9th Cir. 1996), as amended (June 17,

1996); *see also Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202, 207 (6th Cir.

1991); *Nat'l Rifle Ass'n of Am. v. Potter*, 628 F. Supp. 903 (D.D.C. 1986) (explaining history).

NPS has interpreted the Organic Act as mandating:

> The fundamental purpose of the national park system … begins with a mandate to
> conserve park resources and values.  This mandate is independent of the separate
> prohibition on impairment and applies all the time with respect to all park
> resources and values, even when there is no risk that any resources or values will
> be impaired.  NPS managers must always seek ways to avoid, or to minimize to
> the greatest extent practicable, adverse impacts to park resources or values. …
> Congress, recognizing that the enjoyment by future generations of the national
> parks can be ensured only if the superb quality of park resources and values is left
> unimpaired, has provided that when there is a conflict between conserving
> resources and values and providing for enjoyment of them, conservation is to be
> predominant.

Management Policies § 1.4.3.  NPS relied on these provisions in making the decisions described below.

17.     In the final part of the NPS Management Policies representing the agency's official interpretation of the Organic Act, which mandates that NPS pass on the resources of the National Park System for the enjoyment of  future generations, NPS stated that "the Service will strive to restore the integrity of park resources that have been damaged or compromised in the past."   Management Policies § 1.4.7.2.

***Biscayne National Park Establishment Act***

18.     The Park as it exists today was created by Congress in 1980 by Public Law 96-287 (the "Establishment Act").  The Park was established by Congress "to preserve and protect for the education, inspiration, recreation and enjoyment of present and future generations a rare combination of terrestrial, marine, and amphibious life in a tropical setting of great natural beauty."  16 U.S.C. § 410gg.  Congress provided that NPS was to manage the Park in accordance with the Organic Act, *id*. § 410gg-2, discussed above.  As NPS acknowledged, "Congress recognized 'the unique and special values' of the resources within [the Park], as well as the 'vulnerability of these resources to destruction or damage due to the easy human access by water.'  (House of Representatives Report 96-693 [at 4 (1979)]).  Congress therefore directed NPS to 'manage this area in a positive and scientific way in order to protect the area's natural resource integrity.'"  NPS, Fishery Management Plan Final Environmental Impact Statement (May 2014) ("FMP EIS") at ii.

19.     Congress expressly addressed fishing in the Establishment Act:

> The waters within the park shall continue to be open to fishing in conformity with the laws of the State of Florida, except as the Secretary, after consultation with appropriate officials of said State, designates species for which, areas and times within which, and methods by which fishing is prohibited, limited, or otherwise regulated in the interest of

> sound conservation to achieve the purposes for which the park is
> established; Provided, That with respect to lands donated by the State after
> the effective date of this Act, fishing shall be in conformance with State
> law.

16 U.S.C. § 410gg-2(a).   Nevertheless, after quoting the foregoing passage from the

Establishment Act, NPS stated that it "must also manage its fishery resources according to park

and NPS mandates and legislation."  NPS, Biscayne National Park Final General Management

Plan/Environmental Impact Statement (Apr. 2015) ("GMP EIS") Vol. I at 11.

20.     NPS has long prohibited commercial fishing within waters subject to the

jurisdiction of the United States located within the boundaries of the National Park System

"except where specifically authorized by Federal statutory law."  36 C.F.R. §§ 1.2(a)(3), 2.3

(d)(4).

*The National Environmental Policy Act*

21.     Under NEPA, 42 U.S.C. §§ 4321-4370, and under regulations adopted thereunder

by the Council on Environmental Quality ("CEQ"), tasked with implementing NEPA, an agency

such as NPS must consider every significant aspect of the environmental impact of a proposed

action and explain its considerations of the environmental consequences and publish its

evaluation and preferred alternative, among other things, in an environmental impact statement

("EIS").  40 C.F.R. § 1502.1 *et seq.*   The agency must then, upon making a decision as to its

course of action,  "prepare and timely publish a concise record of decision," which shall "State

the decision."  *Id.* § 1505.2.

22.     The CEQ has interpreted the effect of its regulations: "The terms of a Record of

Decision are enforceable by agencies and private parties. A Record of Decision can be used to

compel compliance with or execution of the mitigation measures identified therein."  *See* Forty

Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46

Fed. Reg. 18026, 18037 (Mar. 23, 1981).  Courts have found that guidance document authoritative

in interpreting CEQ's regulations.  *See, e.g., Russell Country Sportsmen v. U.S. Forest Serv.*, 668

F.3d 1037, 1045 (9th Cir. 2011).

**The Administrative Procedure Act**

23.     Under the APA, the reviewing court shall "set aside agency action . . . found to be

(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706.

24.     The APA permits legal claims thereunder for "final agency action," and defines

"agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13).  An agency action is final if

it satisfies two requirements: "First, the action must mark the consummation of the agency's

decision making process--it must not be of a merely tentative or interlocutory nature.  And

second, the action must be one by which rights or obligations have been determined, or from

which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (first

quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then

quoting *Port of Bos. Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71

(1970)).  Under the first part of the test, courts ask "not whether there are further administrative

proceedings available, but rather 'whether the impact of the order is sufficiently 'final' to

warrant review in the context of the particular case."  *Citizen's Ass'n of Georgetown v. Fed.*

*Aviation Admin.*, 896 F.3d 425, 431 (D.C. Cir. 2018) (quoting *Friedman v. Fed. Aviation Admin.*,

841 F.3d 537, 542 (D.C. Cir. 2016)).

25.     In addition to permitting challenges to final agency actions, the APA permits

reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed,"

5 U.S.C. § 706(1); *see also* §§ 551(13) (defining "agency action" to include a "failure to act"),

555(b) (agencies are required to conclude matters presented to them "within a reasonable time"). Claims challenging an agency's failure to act do not need to pass the *Bennett v. Spear* test for finality.  Instead, the Supreme Court has endorsed "'failure to act' claims … so long as a complaining party has sufficiently alleged 'that an agency failed to take a discrete agency action that it is required to take.'"  *See also W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1248 (D.C. Cir. 2018) (Edwards, J., concurring) (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) ("*SUWA*")).  *See also Elec. Privacy Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1244–45 (D.C. Cir. 2018) (limiting analysis of agency inaction claims to the *SUWA* test).

### The Freedom of Information Act

26.     FOIA was enacted to ensure government transparency and the expeditious disclosure of government records.  FOIA establishes the public's right to access all federal agency records unless an agency satisfies its burden to show that it may withhold them pursuant to one of nine narrowly-construed FOIA exemptions.  *See* 5 U.S.C. § 552(a)(4)(B), (b)(1)-(9).

27.     FOIA imposes strict deadlines on federal agencies to respond to a request for records.  Within 20 working days of receiving a FOIA request, an agency must make a determination whether to comply with the request and notify the requester of its determination and the reasons for it.  *See id.* § 552(a)(6)(A)(i).  The agency is required to indicate "the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions."  *Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 186 (D.C. Cir. 2013).

28.     The agency must make any responsive records "promptly" available, *see* 5 U.S.C. § 552(a)(3)(A), unless it can establish that it may lawfully withhold those records from disclosure under the narrowly-defined FOIA exemptions listed in Section 552(b).

Administrative remedies are deemed exhausted when an agency fails to comply with applicable time limits. *Id.* § 552(a)(6)(C)(i).

## FACTUAL ALLEGATIONS

### *The Park*

29.      As NPS describes the Park on its website, "Within sight of downtown Miami, yet worlds away, Biscayne protects a rare combination of aquamarine waters, emerald islands, and fish-bejeweled coral reefs."[1] The Park is the "largest marine park in the national park system," GMP EIS Vol. I at 11, encompassing approximately 173,900 acres of "mostly submerged land and includes coral reefs, sandy shoals, 4,825 acres of largely undeveloped mangrove shoreline, and 42 keys or islands primarily composed of limestone and coral." *Id.* at 5.  The Park "is recognized for its natural resources, which represent a complex combination of terrestrial, marine, and amphibious wildlife species in a subtropical setting of great natural beauty."  *Id.* at 6.

30.      The Park is "a significant resource to the American public."  *Id.* at 9.  Its "coral reefs and keys, estuarine bay, and mangrove coast is a significant and integral portion of the South Florida ecosystem within the wider Caribbean community where diverse, temperate, and tropical species mingle." *Id.* at 9.  These species include "tropical/subtropical animals and plants found nowhere in the United States but South Florida," resulting in a level of biological diversity that is "more than most U.S. national parks." *Id*. at 10. The Park also "preserves a largely undisturbed gene pool of tropical and subtropical flora" and "unique marine habitat and nursery environments that sustain diverse and abundant native fishery resources."  *Id.* at 9.  As a result, the Park is home to "more than 325 fish and marine macroinvertebrate species," including "bonefish, snook, tarpon, permit, pink shrimp, spotted sea trout, oysters, clams, blue and stone

---

[1] *Available at* nps.gov/bisc/index.htm (last visited Dec. 15, 2020).

crabs, bait fishes, and numerous coral reef fishes including snappers, groupers, grunts, barracuda, spadefish, spiny lobster, parrotfish, surgeonfish, and triggerfish." *Id.* at 173.

31.     The Park "encompasses a mosaic of submerged aquatic communities, including seagrasses, hardbottom, barebottom, and coral reef. The combination of these communities makes the area ecologically rich and biologically diverse." *Id.* at 182.

32.     The Park is popular with visitors who engage in a wide range of recreational activities, including powerboating, sailing, paddling, windsurfing, kiteboarding, fishing, nature and wildlife viewing, swimming, and interpretative programs. Many people scuba dive and snorkel to see coral, fish and underwater artifacts. *Id.* at 212-13. Water-based recreation includes paddling, fishing, boating and scuba diving, with recreational fishing being among the most popular park activities. Guided sportfishing is another important economic activity in the bay. *Id*. at 235. In 1997, an estimated 50,000 vessels used the Park for a variety of activities, of which almost 30,000 boats participated in fishing. *Id*. at 235.

***NPS Undertakes Planning To Protect the Park's Failing Resources***

33.     The Park's coral reef ecosystems have been in continuous decline for a number of years, in large part due to fishing pressure and the grounding of ships, as well as other factors outside NPS's control. *See* GMP EIS Vol. I at 19, Vol. II at 163.

34.     In addition, NPS stated that "there is agreement that the fishery resources within the park are extremely stressed and need special attention." FMP EIS at viii. "[F]isheries in [the Park] have declined from historical levels due to increasing population and related fishing pressure." *Id.* at v.

35.     Under these circumstances, NPS began work in 2000 on two planning efforts, one to develop a new General Management Plan for the Park ("GMP") and the other, in cooperation

with FWC, to develop a Fisheries Management Plan ("FMP").  For both plans, NPS undertook

the preparation of environmental impact statements under NEPA.

### NPS Determines to Implement A Marine Reserve Zone as Part of A New General Management Plan

36.     Each unit of the National Park System must prepare and adopt a "general

management plan" establishing how the park unit is to be managed over the following fifteen to

twenty years.

37.     Fifteen years after commencing the planning for the Park's new general

management plan, and after 30 public meetings and more than 107,000 written comments, NPS

finalized the GMP EIS for the Park in April 2015.  The GMP EIS presented and evaluated eight

potential alternatives for the Park to manage resources and visitor use, evaluating the impact

each alternative would have on the resources and values of the Park.  GMP EIS Vol. I at 72-126.

The GMP EIS reflects not only extensive public input but also extensive consultation with the

FWC.  For each alternative, NPS evaluated whether and the extent to which those alternatives

would address the needs for which the plan was being prepared and the impact that alternative

would have on the Park's resources and values.  *Id.* at 255-431.

38.     On August 31, 2015, NPS signed a Record of Decision under NEPA ("GMP

ROD"), selecting Alternative 8 as the Park's new GMP.  That alternative included a marine

reserve zone, as described below.  In addition, NPS made a determination that the plan there

adopted would not impair the Park's resources or values (the "Non-Impairment Determination").

39.     The Organic Act mandates that NPS is to manage the National Park System in

such a manner as to leave its resources unimpaired.  *See* paragraphs 14-17, *supra*.  NPS has

explained that an impact "would be more likely to constitute an impairment to the extent that it

affects a resource or value whose conservation is … necessary to fulfill specific purposes

identified in the establishing legislation …, or key to the natural or cultural integrity of the park

or to opportunities for enjoyment of the park, …."  GMP EIS Vol. I at 13-17 (explaining Organic

Act).  In the Non-Impairment Determination, NPS made determinations as to which resources in

the Park were both necessary to fulfill the purposes for which the Park was established and key

to the natural integrity of the Park.  That determination included the following, among others:

- Healthy fish populations, and

- Submerged aquatic communities, such as the coral reef and seagrasses, the combination of which makes the area "ecologically rich and biologically diverse."

GMP ROD at 25-30.

40.     A key component of the GMP was "a marine reserve zone where fishing is

prohibited." GMP EIS Vol. I at 123.  The marine reserve zone encompasses only "about 6% of

the waters of the park," in which "[r]ecreational and commercial fishing will be prohibited" but

other activities, such as swimming, snorkeling, scuba diving and viewing the reefs from glass

bottom boats, would be allowed.  GMP ROD at 6.  NPS determined that the marine reserve zone

would have beneficial impacts on submerged aquatic communities and on the health of the fish

populations in the Park, among other resources.  *Id.* at 25, 27.  NPS also determined that

establishing a marine reserve zone would give the Park's reefs the greatest opportunity for reef

ecosystem recovery in order to be resilient to external threats such as climate change.  GMP EIS

Vol. I at 125.

41.     NPS explained in its GMP ROD that it decided to adopt what became the Park's

new GMP because that plan would "emphasize strong natural and cultural resource protection

while providing a diversity of visitor experiences. … A limited amount of resource impacts will

be tolerated in high-use areas of the park.  Some visitor activities will be restricted in certain

areas to protect sensitive resources and allow wildlife a respite from human contact."  GMP

ROD at 2.   Specifically, a marine reserve zone would provide a high level of protection to the coral reef and associated species while allowing visitors who snorkel, scuba dive and ride glass bottom boats to experience a natural, healthy coral reef with larger and more numerous fish. GMP ROD at 5, 6-7.

42.    "The purpose of the proposed marine reserve zone is to provide snorkelers and divers with the opportunity to experience a healthy, natural coral reef, with larger and more numerous tropical reef fish and an ecologically intact reef system, while not being so large as to completely eliminate the opportunities for fishing any park reef areas.  Visitors to parks in the American West expect to see large trees such as sequoias and redwoods, and large healthy populations of big mammals such as bison and elk.  Similarly, visitors to the largest marine park should expect to see healthy coral reefs teeming with diverse communities of large, healthy fish." GMP EIS Vol. II at 163.

43.    NPS determined the specific size and location of the marine reserve zone.  The marine reserve zone was to be located in an area of the Park in which Congress gave NPS the ultimate authority to protect the Park's resources, notwithstanding any different approach taken by State agencies.  *See* 16 U.S.C. § 410gg-2(a); GMP EIS Vol. II at 164-68.  NPS specifically invoked this statute, noting that the Secretary of the Interior has the power "to prohibit or limit fishing in areas within the boundaries of the original national monument for reasons of conservation, visitor experience, or to achieve the purposes for which the park is established." GMP EIS Vol. II at 164.  NPS identified the 10,502-acre marine reserve zone out of the 173,900 total acres in the Park acres with the following map. GMP EIS Vol. I at 147 (*emphasis of red arrow and border around marine reserve zone added*):



44.     The marine reserve zone was to be located in an area where significant coral reefs are located.  "Coral reefs are among the most diverse and biologically complex ecosystems on earth. … [The Park] is important to the function and dynamics of the larger Florida reef tract because it provides important habitat for both larvae and juveniles of a diverse array of species."

GMP EIS Vol. I at 183-84.  Coral communities in the Park are comprised of patch reefs and the reef tract.  Patch reefs are structures of living corals, which can stretch to masses more than 150 feet across tending to rise to within 2 to 3 feet of the water surface.  These reefs provide habitat to a large variety of fishes and other marine life.  *Id*. at 184.  The reef tract is predominantly coral rubble with live corals lining the seaward side near deeper water and the Florida current.  Two main outer reef types occur in the Park.  One is represented by Long Reef, which is a long, low, shallow structure formed by loose coral rock and sheets of dead coral, within and under which exists a wealth of marine life.  The second type is represented  by Ajax Reef and is made of live coral colonies.  *Id*.  Both Long Reef and Ajax Reef are within the marine reserve zone, along with others.

45.     Among the corals in the Park are two species listed as threatened under the Endangered Species Act, elkhorn coral and staghorn coral.  All waters east of the chain of islands running from north to south in the Park are included in an area that has been designated as critical habitat for these species.  *Id.* at 181.  The marine reserve zone designated in the GMP is within that area.  *See* map, paragraph 43, *supra.*

46.     The area chosen to be designated as a marine reserve zone was developed through a "reasoned and documented scientific approach that incorporated public input."  GMP EIS Vol. II at 164-65.  Scientific input was obtained not only from NPS scientists but also those from universities and the U.S. National Oceanic and Atmospheric Administration ("NOAA").  The specific location was chosen after a science review meeting in 2009.  *Id.* at 167; *see generally id.* at 163-69.  As to zone location, NPS stated: "[T]hese areas were selected, in part, because they include a variety of reef types for visitors to experience, including existing markers that could serve as boundary markers, living coral cover, documented fish use by targeted fish species, and

17

some of the Maritime Heritage Trail shipwrecks that visitors enjoy snorkeling and diving on."
*Id*. at 167-68.  A marine reserve zone was central to the NPS' preferred alternative because
"[r]esearch has shown that marine reserves deliver a wide range of benefits to conservation,
science, and general management."  GMP EIS Vol. I at 410.

47.     NPS found, based on scientific studies, that "[i]t would be expected that the
adverse impacts on the reef from boating and fishing activities would be significantly reduced
[by establishment of the marine reserve zone].  In particular, the potential for scarring, coral
breakage or damage, from boat propellers, vessel groundings and anchor damage would be
greatly reduced, but there could still be adverse impacts from other currently existing
recreational activities such as scuba diving …."  *Id.* at 419.  In conclusion, "in the areas zoned
for resource protection, including the marine reserve zone, there would be long-term beneficial
impacts on submerged aquatic communities."  *Id.* at 420.   NPS also found, again based on
scientific studies, that implementation of the marine reserve zone would result in long term
beneficial impacts on Park fishery resources.   "Marine reserve zones allow not only for the
recovery of fish species/stocks, they provide sufficient protection for the ecosystems they
encompass."  *Id.* at 410.  In addition, the implementation of the marine reserve zone would
"virtually eliminate the on-site generation of fishing-related marine debris and its associated
impacts on submerged cultural resources, which would be a long-term beneficial impact."  *Id*. at
421; *see also* GMP ROD at 12 (mitigation measures relating to marine reserve zone).

**More Than Five Years After Adopting the GMP ROD, NPS Has Not Implemented the
Marine Reserve Zone**

48.     Pursuant to the ROD, the marine reserve zone was to be instituted "as soon as
practicable."  GMP ROD at 7.  In a presentation given publicly to explain the final GMP EIS,
NPS stated that the target date for the establishment of the marine reserve was 2016.  (NPS

Briefing, May 2015 at 10.)   Nevertheless, NPS has not implemented a marine reserve zone and the negative adverse impacts on the reefs and fisheries have continued unabated.

49.     In October 2015, NOAA expressed alarm at the bleaching of coral reef systems worldwide.  According to NOAA, a severe coral bleaching episode began in the Florida Keys and South Florida in August 2015.  NOAA stated:  "unsustainable fishing practices stress the health of corals and decrease the likelihood that corals can either resist bleaching, or recover from it."  In November 2015, based on this information, NPCA urged NPS promptly to implement the marine reserve zone to protect the Park's reef system even while the administrative rulemaking process to do so was pending.  FWC vigorously protested the implementation of marine reserve zone, however, and NPS has failed to move forward on such implementation.  In July 2018, the Park's Fishery and Wildlife Biologist stated internally that no mention of the marine reserve zone should be made in a document to be made public because "it is not actively on the table as something being considered."

50.     On March 5, 2020, the official Biscayne National Park Service Instagram account posted the following "sobering news," reporting that the live coral cover in the Park "has declined drastically in the last few years":[2]

---

[2] Screenshot taken on June 12, 2020.  The full text of the post is:

> We're sharing some sobering data courtesy of NPS scientists from the South Florida and Caribbean Inventory & Monitoring Team.  Since 2004, this team has been conducting annual surveys of live coral cover at two reefs in the southern portion of Biscayne.  Notice that coral cover at both reefs has declined drastically in the last few years, and coral cover is now at its lowest value since monitoring began 15 years ago.  These declines can be attributed to a myriad of factors.  Bleaching events (which are related to water temperatures), coral disease outbreaks, hurricanes, intensive fishing pressure, water quality, fishing gear (such as traps and monofilament) on the reef, and divers touching the reef are some of the stressors that can result in loss of coral.  Does your personal experience at Biscayne go back 15 years (or more), like this dataset? Have you personally observed a change in the health of the reef?  What's your perspective?  Please share your thoughts below. #KeepBiscayneBeautiful #science #nationalpark.

Biscayne National Park (@biscaynenps), Instagram,
https://www.instagram.com/p/B9XrQzTAuPS/?utm_source=ig_web_copy_link (last visited Dec. 15, 2020).



51.     The Park specifically identified "intensive fishing pressure" and "fish gear (such

as traps and monofilament) on the reef" as two of several factors that resulted in the "loss of

coral."  That loss has led the coral cover to be at "its lowest value since monitoring began 15

years ago."

***NPS Determines to Phase Out Commercial Fishing in the Park But Fails to Do So Six Years Later***

52.     In 2000, NPS began work on a "fisheries management plan."  Four public

comment periods, which involved a series of public meetings, occurred from April to May, 2003.

In the fall of 2003, NPS, FWC, and the Florida Keys National Marine Sanctuary Advisory

Council formed a Working Group, consisting largely of recreational and commercial fishermen,

to generate recommendations for the fishery management plan.  The Working Group met six

times between January and October 2004 and presented its recommendations in October 2004.

FMP EIS Appx. 5.  A draft Environmental Impact Statement was issued for public comments in

August 2009, and NPS held three public meetings.  In May 2014, NPS issued its FMP EIS.  On

July 10, 2014, NPS signed the Record of Decision for the FMP ("FMP ROD").

53.     NPS stated that "increases in South Florida's boating and fishing population combined with improved fishing and boating technology pose a threat to the long-term sustainability of the fishery-related resources" of the Park. FMP EIS at i. A fishery management plan is deemed necessary to guide sustainable use of [the Park's ] fishery-related resources, as recent studies suggest that many of [the Park's] fishery resources are in decline." *Id*. The EIS identified and analyzed five alternative plans for the management of the fisheries in the Park to achieve that desired future condition.

54.     NPS identified Alternative 4 as its "preferred alternative." This alternative included, among other things, regulations "eventually leading to no commercial fishing in [the park]." *Id*. at 26-27.

55.     In the GMP EIS, NPS stated:  "Although commercial fishing occurs in Biscayne National Park, it has been prohibited for more than 30 years (see 48 F.R. 30282, June 30, 1983) because it was not specifically authorized by Congress."  GMP EIS Vol. II at 305; *see also* 36 C.F.R. §§ 1.2(a)(3), 2.3 (d)(4).

56.     NPS recognized that commercial fishing in the Park was contributing to the decline in the fishery.  From 1964 to 1998, the commercial fishing fleet in South Florida grew 197%.  FMP EIS at 5.  The commercial fishing fleet targets numerous species including invertebrates (lobster, blue crabs, stone crabs, and bait shrimp), food fish (typically members of the snapper/grouper complex; concentrated on yellowtail snapper) and bait fish (e.g., ballyhoo, Spanish sardines, thread herring and pilchards).  *Id*. at 4.

57.     In the Fisheries Management Plan, NPS stated that its chosen alternative would phase out commercial fishing over time, "eventually leading to no commercial fishing in [the Park]."  FMP EIS at 27; FMP ROD at 5.  No new commercial fisheries would be permitted to

develop, including "wingnet" shrimp fishing.  FMP EIS at 21, 24, 26.  NPS stated that it would

codify the limitations on commercial fishing through adoption of a special regulation.  FMP EIS

at 26.  That special regulation, meaning one applying only to the Park, would create an exception

from the otherwise applicable regulation prohibiting all commercial fishing in the Park.  In the

FMP EIS, FWC agreed with NPS that NPS would "gradually phase out commercial fishing

activity."  *Id.* at 244 (FWC and NPS jointly responding to comments, as explained at 242).

58.     In 2014, a NPS Regulations Program Specialist based in Washington, D.C.

drafted such a special regulation to implement these limitations on commercial fishing.  But NPS

has never proposed such a special regulation for public comment and has not adopted such a

regulation in the more than six years that have since elapsed.  Accordingly, commercial fishing

has been illegal within the Park during all this time.

***NPS enters into a Memorandum of Understanding with FWC In Which NPS Agreed Not to
Implement the Marine Reserve Zone if Less Restrictive Measures Would Suffice and In
Which NPS Agreed to Continue to Allow Illegal Commercial Fishing***

59.     On August 31, 2020, NPS executed a Memorandum of Understanding with FWC

(the "MOU").  NPS there agreed with FWC not to  implement the marine reserve zone unless

and until it could show that less restrictive management actions would suffice and agreed to the

regulation of commercial fishing instead of phasing it out.   The term of the MOU is five years,

and it may be extended for an additional five years.  MOU at 9.

60.     The purpose of the MOU, it stated, was to "facilitate the management,

conservation, and scientific study of fish and aquatic resources within [the Park] by improving

communication, cooperation and coordination between [FWC] and the Park".  *Id.* at 1.  The

parties' intention  as stated in the MOU was for that management, conservation, and scientific

study to be "based on the jointly developed science plan, 'Assessing the Efficacy of Fishery

Management Changes Implemented for the Biscayne National Park Fishery Management Plan,'

(hereinafter referred to as the Science Plan), the objective of which is to evaluate the effect and efficacy of the regulations promulgated by FWC to achieve the goals of the Fishery Management Plan." *Id.* at 3.   The "regulations promulgated by FWC" referred to in that sentence are regulations FWC had adopted, with NPS's support, setting size limits on fish catches and bag limits on recreational (but not commercial) fishermen, among other things, which became effective July 1, 2020 (the "FWC Regulations"). That Science Plan  provides for research and monitoring of fishery resources, changes in commercial fishing activities, and "fishing-related benthic habitat impacts".  *Id.* at 5.  The term "benthic" refers to anything associated with or occurring on the bottom of a body of water, so NPS has agreed with FWC to monitor the impacts of fishing on the Park's coral reefs.

61.    NPS agreed that it would "seek the least restrictive management actions necessary to fully achieve the [FMP's] mutual management goals for the fishery resources of the Park and adjoining areas."  *Id*. at 2.   That language was followed by this statement:  "Furthermore, both parties recognize the FWC's position that marine reserves (no-take areas) are overly restrictive and acknowledge that the FWC does not intend to implement a marine reserve (no-take area) in Park waters as part of the Fishery Management Plan."  The importance of that FWC position becomes clear later in the MOU, where NPS agrees that FWC will continue "to play a crucial role" in promulgating and implementing new regulations as deemed necessary to achieve the mutual fishery management objectives.  *Id*. at 6.  Moreover, while federal regulations might be permissible under the MOU, NPS agreed that "FWC and the Park will determine if additional management measures should be considered in order to accomplish these FMP goals."  *Id.* at 8.  NPS also agreed to "work closely with FWC during the development and promulgation of any Federal regulatory changes in support of the [FMP]."  *Id.*

62.    Accordingly, rather than implementing the marine reserve zone NPS had determined to implement in the GMP ROD "as soon as practicable,"  GMP ROD at 7,  NPS agreed in the MOU that it would work with the FWC in monitoring and researching the effectiveness of the FWC Regulations in achieving the FMP's goals; that such monitoring and research would include monitoring "fishing-related benthic habitat impacts," MOU at 5, the avoidance of which was one of NPS's stated reasons for determining to implement the marine reserve zone; and that such a zone would only be established if NPS could demonstrate that it is "necessary" in order to achieve the FMP's goals to establish such a zone.  GMP ROD at 12-13.

63.    In addition, NPS agreed in the MOU that it would abandon its decision to phase out commercial fishing and that NPS would work with FWC to determine what regulations would be applied to such fishing.  For example, NPS agreed with FWC that "properly regulated fishing will continue" in the Park, and NPS recognized that "commercial fishing constitute … activities of statewide importance that benefit the health and welfare of the people of the State of Florida."  MOU at 2.  Again, NPS also agreed that it would seek the "least restrictive management actions necessary."  *Id*.  NPS also agreed that, "to determine what additional management actions are necessary to achieve stated management goals,"  the parties would "jointly evaluate" commercial and recreational fishing, including "a full review of all commercial and recreational fishery practices, harvest data, permitting requirements, techniques and other pertinent information."  *Id*. at 6; *see also id*. (FWC will continue "to play a crucial role" in promulgating and implementing new regulations as deemed necessary to achieve the mutual fishery management objectives), *id*. at 7 (parties agree to make efforts "to the maximum extent possible to cooperate fully and jointly manage fishing" when they disagree).

64.     The parties agreed in the MOU to prepare an interim report on the first three years of data collection and a final report on the six years of such collecting.  *Id.* at 8.

## PLAINTIFF'S STANDING FOR APA CLAIMS

65.     NPCA's members have an aesthetic, recreational, educational, and spiritual interest that will be harmed by the NPS's failure to act, including harmful impacts to the fisheries, the coral reef ecosystem, water, scenery and wildlife in the Park.  Many of the NPCA's members live near and regularly visit the Park, for fishing, diving, recreation, boating, observation, and other similar uses, and they will continue to do so into the future.  They are drawn to the unique marine resource, the unusual beauty of the Park, and they enjoy the fishing and scuba diving, exploring the Park and engaging in other recreational activities.  They have observed the damages to the marine ecosystem -- especially to fish stocks, sea grasses and coral reefs -- caused by the NPS's failure to implement the marine reserve zone and its failure to implement the GMP and FMP, especially the decision to phase-out commercial fishing.

66.     Further, Defendants' failure to take the actions required in the GMP and ROD "as soon as practicable" and Defendants' failure to preserve the Park as mandated by the Organic Act is interfering with and will interfere in the future with NPCA's members' ability to enjoy the Park.

67.     One member of the NPCA is Dr. Martin Arostegui, a resident of Coral Gables, Florida who has used and enjoyed the Park, especially for recreational fishing, snorkeling, and scuba diving, for over 50 years.  Mr. Arostegui visits about 15 times each year and is planning to continue to visit and use the Park.  Over those years, Mr. Arostegui has seen firsthand the decline in the size and quantity of fish and the harm caused to the coral reefs caused by commercial as well as recreational fishing.  For a number of years, Mr. Arostegui has been and is an active spokesperson for improving the aquatic environment of the Park.  He has studied the benefits of

marine reserves and meets with community groups and schools to present about the benefits of implementing the marine reserve at the Park. He participated in NPS's public meetings as it developed the GMP and supported the creation of a marine reserve zone. NPS's failure to take the steps it determined to take in the GMP to implement the marine reserve zone and in the FMP ROD to phase out commercial fishing is interfering with and will interfere with Mr. Arostegui's enjoyment of the Park.

68.     Another member of the NPCA is Randolph Wayne Smith, a 72 year old retired charter boat captain who has fished in the Park for his entire life. Mr. Smith visits the Park at least once a week to fish and will continue to visit the Park to fish. During his decades of fishing in the Park, he has witnessed the steady decline in both the quantity and the size of fish caused by commercial as well as recreational fishing. He strongly believes that the immediate establishment of a marine reserve is necessary to improving the fishing, as he has seen happen in the Dry Tortugas. The decrease in the size and quantity of fish caused by the NPS's failure to implement the commercial fishing restrictions in the FMP and failure to create a marine reserve zone impairs and will impair Mr. Smith's enjoyment of the Park.

69.     A third NCPA member, Gilbert Muratori, a coast guard licensed charter boat captain for 18 years, guided anglers in and around the Park until his recent retirement. Mr. Muratori enjoyed the scenic and recreational opportunities in the Park. In fact, in order to protect the park, he was an instructor in a course taught to violators of fishing regulations in the Park. Mr. Muratori also has fished recreationally in the Park for the past 40 years and continues to fish in the Park approximately once a week and expects to do so into the future. Over his many years in the Park, Mr. Muratori has witnessed the decline in the fish quantity and size, which has diminished his enjoyment of the Park. Mr. Muratori has seen the damage to the Park ecosystem

caused by commercial fishing and NPS's failure to implement its GMP concerning the marine reserve zone.  For the past few years, Mr. Muratori has travelled to speak to various groups to promote the establishment of a marine reserve zone inside the Park.  He understands that a marine reserve zone, such as the one that the NPS determined must be quickly implemented at the Park, will improve the Park marine ecosystems, and that, absent such a zone, the continued decline in the size and quantity of fish and the harm to the marine ecosystem will impair his enjoyment of the Park.  NPS's failure to act impacts the Park and its fishery resources and continues to harm Mr. Muratori's enjoyment of the Park.

## CLAIMS

### FIRST CLAIM FOR RELIEF
(Against All Defendants)

**(Failure to Implement Marine Reserve Zone: Administrative Procedure Act, 5 U.S.C. § 706; Violation of Organic Act, 54 U.S.C. § 100101; Unlawful Actions and Failure to Act and Unreasonable Delay in Acting; Arbitrary and Capricious Actions and Failure to Act and Unreasonable Delay in Acting)**

70.     Plaintiff incorporates here the allegations of paragraphs 1-69 above.

71.     Under the APA, a court is to set aside and find unlawful federal agency actions which the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Separate from the duty of the reviewing court to assess whether the agency has acted "not in accordance with law," the duty of a court reviewing agency action under the "arbitrary and capricious" standard is to ascertain whether the agency "examine[d] the relevant data and articulate[d] … a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  In reviewing the agency's explanation, if there is one, the reviewing court must determine whether the agency considered all "relevant factors and whether there has been a clear error of

judgment." *Id.* (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285 (1974)) (citations omitted).  Agency action will be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

72.     NPS determined in 2015 to implement the marine reserve zone as specifically designated in the GMP EIS and ROD "as soon as practicable."  NPS determined in its GMP EIS that the Park's coral reef ecosystems had been in continuous decline for a number of years, in large part due to fishing pressure and the grounding of ships, as well as other factors outside NPS's control.  GMP EIS Vol. II at 163; GMP ROD at 8.  Largely to improve the conditions of those reefs, NPS determined in its GMP to create the marine reserve zone where fishing would be prohibited.  NPS determined exactly the location of and the restrictions applicable to that marine reserve zone.

73.     Yet more than five years later, NPS has failed to do so and has unreasonably delayed in doing so.  Moreover, by agreeing in the MOU to seek the "least restrictive management actions necessary," NPS has effectively agreed to delay even longer, perhaps for as many as six more years, such implementation and perhaps that NPS would never implement that measure.  These delays are unreasonable, particularly given the continuing decline in the coral reefs that would have been protected by such a marine reserve zone.  Failure to implement that zone was not in accordance with law.

74.     By these actions, NPS has allowed the Park's coral reef ecosystems to become impaired in violation of the Organic Act.  Moreover, contrary to NPS's official interpretation of

its obligations under that Act, Management Policies § 1.4.7.2, NPS has failed to restore the integrity of the coral reef ecosystems by the measure it determined in 2015 to employ, *i.e.,* implementation of the marine reserve zone.  By failing to implement that marine reserve zone, NPS has also violated the separate mandate of the Organic Act that NPS always manage the National Park System so as to conserve the Park's resources.  *Id.* § 1.4.3; *see also id.* § 8.1 (stating that the Organic Act establishes for NPS, "when necessary, an obligation to regulate [park uses'] amount, kind, time, and place in such a way that future generations can enjoy, learn, and be inspired by park resources and values and appreciate their national significance in as god or better condition than the generation that preceded them").

75.     By entering into the MOU in which NPS agreed to employ as the standard for future management actions that NPS would "seek the least restrictive actions necessary," MOU at 2, NPS has further violated the Organic Act.  That restriction on NPS is fundamentally inconsistent with its fulfilling its obligations under the Organic Act, as interpreted in the Management Polices.  Moreover, NPS acted arbitrarily and capriciously in entering into that MOU because NPS has provided no rationale for doing so that explains how that action was consistent with NPS's obligations to protect the coral reef ecosystem where the marine reserve zone was to be established and how further delay in establishing it would not cause further deterioration of that ecosystem.

### Final Agency Action

76.     An agency action is final for purpose of the APA if it satisfies two requirements: "First, the action must mark the consummation of the agency's decision making process -- it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

*Bennett*, 520 U.S. at 177-78 (first quoting *Chi. & S. Air Lines, Inc.*, 333 U.S. at 113; and then quoting *Port of Bos. Marine Terminal Assn.*, 400 U.S. at 71).  Under the first part of the test, courts ask "not whether there are further administrative proceedings available, but rather 'whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case.'"  *Citizen's Ass'n of Georgetown*, 896 F.3d at 431 (quoting *Friedman*, 841 F.3d at 542.  NPS's entering into the MOU is final agency action under that standard.

77.     In addition to permitting challenges to final agency actions, the APA permits reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1); *see also id.* §§ 551(13) (defining "agency action" to include a "failure to act"), 555(b) (agencies are required to conclude matters presented to them "within a reasonable time").   Claims challenging an agency's failure to act does not need to pass the *Bennett v. Spear* test for finality.  Instead, the Supreme Court has endorsed "'failure to act' claims … so long as a complaining party has sufficiently alleged 'that an agency failed to take a *discrete* agency action that it is *required to take*.'"  *W. Org. of Res. Councils*, 892 F.3d at 1248 (quoting *SUWA*, 542 U.S. at 64 ); *see also Elec. Privacy Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1244–45 (D.C. Cir. 2018) (limiting analysis of agency inaction claims to the *SUWA* test).

78.     NPS's entering the MOU was final agency action in that NPS thereby abandoned or at least substantially delayed further the implementation of its determination in the NEPA GMP ROD to implement the marine reserve zone.  Moreover, after making that determination in a NEPA ROD, NPS's failure to implement that action, apart from the MOU, was agency action unlawfully withheld and unreasonably delayed.  The coral reef ecosystem where that zone is to be established is continuing to decline significantly as a result of that failure.

79.     Accordingly, NPS has taken final agency actions, has failed to take actions and has unreasonably delayed to take actions which are contrary to law and/or arbitrary and capricious.

### SECOND CLAIM FOR RELIEF
### (Against All Defendants)

**(Continuing To Allow Illegal Commercial Fishing and Agreeing to Do So in the MOU: Administrative Procedure Act, 5 U.S.C. § 706; Violation of 36 C.F.R. § 2.3, Organic Act, 54 U.S.C. § 100101; Unlawful Actions and Failure to Act and Unreasonable Delay in Acting; Arbitrary and Capricious Actions and Failure to Act and Unreasonable Delay in Acting)**

80.     Plaintiff incorporates here the allegations of paragraphs 1-79 above.

81.     NPS determined in the FMP to phase out commercial fishing in the Park.  See paragraphs 52-58, *supra*.  But more than six years later, NPS has not adopted special regulations (*i.e.*, regulations applicable only to one park) to implement that decision.

82.     NPS conceded that, in light of  36 C.F.R. § 2.3, which prohibits commercial fishing in National Parks "except where specifically authorized" by Congress, commercial fishing in the Park is unlawful "because it is not specifically authorized" in the Establishment Act.  GMP EIS Vol. II at 305.  In other words, NPS's interpretation of the Establishment Act's provision allowing "fishing" to continue, 16 U.S.C. § 410gg-2(a), does not "specifically" authorize commercial fishing.  NPS adopted 36 C.F.R. § 2.3 as part of a comprehensive revision of its regulations in 1983 in response to Congress' 1978 amendment to the Organic Act.  General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30252, 30283 (June 30, 1983).  In that amendment, Congress admonished NPS that "[t]he authorization of activities shall be construed and the protection, management, and administration of [the National Park System] shall … not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically

provided by Congress."  48 Fed. Reg. at 30252 (quoting provision), currently codified at 54

U.S.C. § 100101(b)(2).  *See also Potter*, 628 F. Supp. at 909-10 (explaining 1983 amendments to

NPS regulations); *Mich. United Conservation Clubs*, 949 F.2d at 206–07 (citing *Potter* regarding

same); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d at 1451–52 (same).  Accordingly, the

authorization of "fishing" in the Establishment Act cannot be interpreted as including

commercial fishing because Congress did not there directly and specifically provide for such

commercial exploitation of the Park and because such an interpretation would be in derogation of

the purposes for which the Park was established, as there stated: "in order to preserve and protect

for the education, inspiration, recreation, and enjoyment of present and future generations."  Pub.

L. No. 96-287, § 101, 94 Stat. 599, 599 (1980); *see also Mich. United Conservation Clubs*, 949

F. 2d at 207 ("[U]nlike national forests, Congress did not regard the National Park System to be

compatible with consumptive uses.").

83.     Nevertheless,  NPS has agreed in the MOU that instead of phasing out

commercial fishing as determined in the FMP ROD, such fishing would continue and that NPS

would work with FWC to determine what regulations would be applied to such fishing.  For

example, NPS agreed with FWC that "properly regulated fishing will continue" in the Park, and

NPS recognized that "commercial fishing constitute[] activities of statewide importance that

benefit the health and welfare of the people of the State of Florida."  MOU at 2.

84.     Moreover, the process to which NPS has agreed in the MOU, including more

research and more monitoring, will at least delay, perhaps for many more years, a decision as to

what regulations of commercial fishing, if any, on which NPS and FWC can agree.  And that

agreement, if any, will need to meet the standard adopted in the MOU that the parties would

adopt the "least restrictive" regulations necessary.  MOU at 2.

85.     Six years ago, NPS found in its FMP EIS that "there is agreement that the fishery resources within the park are extremely stressed and in need of special attention."  FMP EIS Vol. I at viii.  NPS noted the sharp increase in commercial fishing vessels in South Florida, along with those of recreational fishermen, as well as the "considerable improvement in fishing efficiency associated with the development and continued improvement of technology such as fish finders, depth indicators, global positioning systems, improved vessel and gear design, increased engine horsepower, and radio communications.  This combination of increasing numbers of participants utilizing increasingly efficient harvesting methods has likely had synergistic negative impacts on [the Park's] fishery resources."  FMP EIS at 5.

86.     Under these circumstances, NPS's failure to cease to allow commercial fishing in the Park and NPS's delay in at least phasing out such fishing over time, is unreasonable.  That is so because, for the six years between completion of the FMP and the decision therein to phase out commercial fishing, commercial fishing continued unabated and contributed to the significant decline in the fisheries of the Park.

87.     NPS's failure to cease allowing commercial fishing in the Park in violation of 36 C.F.R. § 2.3, NPS's abandonment of its determination in a NEPA ROD to phase out commercial fishing over time, and NPS's delay, at least, in phasing out such fishing, is arbitrary and capricious, contrary to the Organic Act and the Establishment Act and NPS's own regulation, 36 C.F.R. § 2.3.

***Final Agency Action***

**88.**     NPS's failure to cease allowing commercial fishing in the Park which is a violation of 36 C.F.R. § 2.3 is agency action unlawfully withheld and unreasonably delayed. NPS's entering into the MOU is final agency action by which NPS agreed to abandon its

determination in the NEPA ROD to phase out commercial fishing and at least further delayed unreasonably NPS's bringing itself into compliance with 36 C.F.R. § 2.3.

## THIRD CLAIM FOR RELIEF
### (against NPS)

### (FOIA, 5 U.S.C. § 552(a))

89.     Plaintiff incorporates the allegation in paragraphs 1-88 above.

90.     In April 2020, Plaintiff  NPCA filed a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") with NPS's Headquarters in Washington, D.C. seeking documents related to the issues raised in this Complaint.  A copy of that request is submitted as Attachment A hereto (the "FOIA Request").  NPCA filed that request because, on information and belief, the decisions not to implement the marine reserve zone and not to adopt regulations phasing commercial fishing were the result of actions or inactions by officials at the Department of the Interior and the NPS Headquarters in Washington, D.C.

91.     Pursuant to FOIA, 5 U.S.C. § 552(a), Plaintiff has a statutory right to access the requested agency records (the "FOIA Documents") in a timely manner.

92.     NPS has failed to comply with the time limits prescribed by FOIA, 5 U.S.C. § 552(a)(6)(A)(i), (a)(6)(E)(iii) in the processing of NPCA's FOIA Request.  NPS has made no determinations as to NPCA's FOIA requests and have produced none of the FOIA Documents to NPCA.

93.     NPS is accordingly improperly and unlawfully withholding public records requested by Plaintiff.

94.     Plaintiff has fully exhausted any administrative remedies it is required to exhaust and now turns to this Court to enforce FOIA's guarantee of public access to agency records and to remedy NPS's withholding of that access.

34

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff NPCA respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants, as follows:

*As to APA Claims:*

A.      Ordering, declaring, and adjudging that Defendants' failure to implement the decisions made by NPS to establish the marine reserve zone set forth in the GMP ROD and to phase out commercial fishing as set forth in the FMP ROD constitutes agency action unlawfully withheld or unreasonably delayed; that NPS's failure to establish the marine reserve zone constitutes a violation of the Organic Act and the Establishment Act; and that commercial fishing in the portion of the Park not donated by the State of Florida is prohibited by 36 C.F.R. § 2.3.

B.      Ordering Defendants to implement the marine reserve zone NPS determined to establish in its GMP ROD on a reasonably expedited schedule;

C.      Ordering NPS to publish a public notice and send it to all permitted commercial fishermen explaining this Court's adjudication that 36 C.F.R. § 2.3 prohibits commercial fishing in the portion of the Park not donated by the State of Florida; provided, however, that this Order shall be suspended if NPS advises the Court that it will phase out commercial fishing in that portion of the Park consistent with NPS's decision to do so set forth in the FMP ROD within a reasonable time, in which case the Court will retain jurisdiction over this matter and NPS shall submit to the Court and to Plaintiff progress reports in such frequency as directed by the Court.

D.      Award Plaintiff's reasonable attorneys' fees and other litigation costs reasonably incurred, pursuant to 5 U.S.C. § 552(a)(4)(E)(i);  and

E..     Grant such further relief as the Court deems necessary or appropriate to redress the Defendants' legal violations.

*As to FOIA Claim:*

A.      Declaring that NPS's failure to make a determination whether to comply with Plaintiff's FOIA Request is in violation of FOIA, 5 U.S.C. § 552(a)(6)(A)(i);

B.      Ordering NPS promptly to provide a determination on Plaintiff's FOIA Request;

C.      Ordering NPS promptly to conduct searches that are reasonably calculated to locate all documents responsive to Plaintiff's FOIA Request;

D.      Entering a permanent injunction enjoining NPS from withholding non-exempt FOIA Documents -- or reasonably segregable portions thereof -- and require that NPS provide such records within 21 days of this Court's order, at no cost to Plaintiff;

E.      Award Plaintiff's reasonable attorney's fees and other litigation costs reasonably incurred, pursuant to 5 U.S.C. § 552(a)(4)(E)(i);

F.      Retain jurisdiction over this action until Defendants are in compliance with FOIA and every order of this Court; and

G.      Award any other relief the Court may deem just and proper.

Dated December 17, 2020

Respectfully submitted,

/s/_Robert D. Rosenbaum
Robert D. Rosenbaum (D.C. Bar No. 90498)
Allison B. Rumsey (D.C. Bar No. 450475)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Tel.: (202) 942-5862
Fax: (202) 942-5999
E-mail: robert.rosenbaum@arnoldporter.com
E-mail: allison.rumsey@arnoldporter.com

Paul Q. Andrews (*pro hac vice forthcoming*)
Arnold & Porter Kaye Scholer LLP

250 West 55th St.
New York, NY 10019
Tel.:  (212) 836-7173
Fax:  (212) 836-8689
E-mail: paul.andrews@arnoldporter.com


*Counsel for Plaintiff National Parks
Conservation Association*