THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:20-cv-03706-RC |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*. | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF ITS MOTION TO ADD EXTRA-RECORD EVIDENCE OR TO ADD <u>DOCUMENTS TO THE ADMINISTRATIVE RECORD</u>**

**<u>CONTENTS</u>**

I.   INTRODUCTION ............................................................................................................. 1

II.  RELEVANT BACKGROUND ....................................................................................... 2

III. ARGUMENT .................................................................................................................. 7

   A.  The Court Should Consider the Documents Whether or Not they are Part of the
       Administrative Record and Irrespective of the Privilege Claim. ........................................ 7

   B.  The Documents Should Not Be Withheld As Deliberative Materials. ............................... 9

      1.   *Documents 1-14 are not pre-decisional and deliberative as to Defendants' failure
          to act.* .................................................................................................................... 10

      2.   *NPS waived any privilege claim when it publicly released the documents under
          FOIA.* ................................................................................................................... 12

      3.   *Correspondence with independent third parties cannot be privileged.* .................. 13

      4.   *A document-by-document review confirms the foregoing points.* .......................... 13

   IV. CONCLUSION ............................................................................................................. 17

i

# TABLE OF AUTHORITIES

**Cases:**                                                                           **Page(s):**

*Abtew v. U.S. Dep't of Homeland Sec.*,
   808 F.3d 895 (D.C. Cir. 2015) ................................................................................ 9

*Access Reps. v. Dep't of Justice.*,
   926 F.2d 1192 (D.C. Cir. 1991) ............................................................................ 10

*Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*,
   110 F. Supp. 3d 215 (D.D.C. 2015) ........................................................................ 9

*BuzzFeed, Inc. v. U.S. Dep't of Just.*,
   419 F. Supp. 3d 69 (D.D.C. 2019) .......................................................................... 11

*Citizens for Resp. & Ethics in Wash. v. U. S. Gen. Servs. Admin.*,
   358 F. Supp. 3d 50 (D.D.C. 2019) .......................................................................... 11

*Citizens for Resp. in Ethics in Wash. v. U.S. Dep't of State*,
   2022 WL 424965 (D.D.C. Feb. 11, 2022) .............................................................. 13

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .............................................................................. 12

*Comm. of 100 on the Fed. City v. Foxx*,
   140 F. Supp. 3d 54 (D.D.C. 2015) ........................................................................... 8

*Conservation Force v. Jewell*,
   66 F. Supp. 3d 46 (D.D.C. 2014), *aff'd*, No. 15-5131, 2015 WL 9309920 (D.C. Cir.
   Dec. 4, 2015) ....................................................................................................... 10

*Dall. Safari Club v. Bernhardt*,
   518 F. Supp. 3d 535 (D.D.C. 2021) ...................................................................... 7, 9

*Democracy Forward Found. v. Pompeo*,
   474 F. Supp. 3d 138 (D.D.C. 2020) ...................................................................... 7, 8

*Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*,
   815 F.2d 1565 (D.C. Cir. 1987) ............................................................................ 10

*Gona v. United States Citizenship & Immigr. Servs.*,
   No. 1:20-CV-3680-RCL, 2021 WL 1226748 (D.D.C. Apr. 1, 2021) .................... 8

*Hinckley v. United States*,
   140 F.3d 277 (D.C. Cir. 1998) .............................................................................. 12

*Judicial Watch v. U.S. Dep't. of Justice*,
   20 F.4th 49 (D.C. Cir. 2021) ................................................................................. 10

*Judicial Watch, Inc. v. U.S. Postal Serv.*,
  297 F. Supp. 2d 252 (D.D.C. 2004).................................................................... 14

*Lawyers' Comm. for Civil Rights Under Law v. U.S. Dep't. of Justice*,
  2020 WL 7319365 (D.D.C. Oct. 16, 2020) ......................................................... 13

*Oceana, Inc. v. Locke*,
  634 F. Supp. 2d 49 (D.D.C. 2009), *rev'd on other grounds*, 670 F.3d 1238
  (D.C. Cir. 2011)...................................................................................................... 9

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997)............................................................................... 9

*Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice*,
  823 F.2d 574 (D.C. Cir. 1987).............................................................................. 12

*In re Subpoena Served Upon the Comptroller of the Currency*,
  967 F.2d 630 (D.C. Cir. 1992)............................................................................... 9

*Stand Up for Cal.! v. U.S. Dep't of Interior*,
  315 F. Supp. 3d 289 (D.D.C. 2018)....................................................................... 9

*U.S. Dep't of the Treas. v. Pension Benefit Guar. Corp.*,
  222 F. Supp. 3d 38 (D.D.C. 2016)................................................................... 10, 14

*In re United States*,
  2017 WL 406243 (1st Cir. Jan. 30, 2017) ........................................................... 11

## Statutes, Rules and Regulations

Organic Act, 54 U.S.C. § 100101 ...................................................................... 2, 3

36 C.F.R. § 2.3(d)(4)........................................................................................... 2, 3

## I.    INTRODUCTION

In this litigation, the National Parks Conservation Association ("Plaintiff" or "NPCA") has challenged the multi-year failure of the National Park Service ("NPS") to implement two final agency decisions: (1) the 2014 decision by NPS and Department of the Interior (together "Defendants") to phase out commercial fishing in Biscayne National Park (the "Park"), and (2) the 2015 decision by NPS to implement in that Park a Marine Reserve Zone ("MRZ").  The present motion involves the administrative record for the challenge.  Defendants submitted an administrative record of eighty documents, and NPCA is seeking to add to the administrative record (or for the Court to otherwise consider) an additional fourteen documents which NPS asserts are "deliberative materials" and therefore inappropriate for inclusion in the administrative record. However, the documents are not protected as deliberative, and they are important because they help explain what actually happened to the implementation of the commercial fishing phase out and MRZ decisions.  These fourteen documents tell the story of NPS making the decisions in 2014 and 2015, acting diligently at first to implement the decisions, and then effectively abandoning the decisions—without explanation to the public—in response to the Florida Fish and Wildlife Conservation Commission's ("FWC") opposition and an apparent change of heart by NPS and the Department of the Interior.

Defendants claim that the fourteen documents are pre-decisional and deliberative and thus not appropriate for consideration by the Court as part of the administrative record.  NPCA disagrees.  Since this case involves a failure to act where the agency decision was already made and the issue is implementation, there is ample precedent for the Court to consider the documents whether or not they qualify for the privilege or are formally made part of an administrative record. However, the fourteen documents do not qualify as deliberative materials in any event, which Plaintiff has explained below both in general and in a document-by-document review.  The

specific documents are separately identified in the Declaration of Allison Rumsey ("Rumsey Decl.") and Exhibit 1. Copies of the documents are included in Exhibit 2.

NPCA submits this memorandum in support of its motion for an Order either directing that these fourteen documents be considered as extra-record evidence in this action or directing Defendants to add them to the administrative record.

## II.    RELEVANT BACKGROUND

The Park, which is located in the South Florida ecosystem, is the largest marine park in the National Park System. Complaint, ECF No. 1 ("Compl."), ¶ 1. NPS manages the Park under the Organic Act, 54 U.S.C. § 100101, and the Enabling Act that created the Park. *Id.* ¶¶ 14–20. Those Acts mandate, among other things, that NPS must not allow any "impairment" of the Park's resources. The Park is home to part of the only barrier coral reef in the continental U.S. and important fisheries that NPS found, after years of study, were "extremely stressed" and in need of protection. *Id.* ¶ 2. Moreover, NPS regulations prohibit commercial fishing in units of the National Park System "except where specifically authorized by Federal statutory law." 36 C.F.R. § 2.3(d)(4). Although no statute specifically authorizes fishing in the Park, NPS nevertheless has allowed commercial fishing to take place for many years, in defiance of existing regulations.

Accordingly, in 2014, after years of environmental impact studies conducted under the National Environmental Policy Act ("NEPA") and consultation with numerous stakeholders, including the FWC, NPS adopted a Record of Decision for a Fisheries Management Plan (the "FMP ROD") in which NPS decided, among other things, to phase out commercial fishing in the Park. Compl. ¶¶ 52–58. In addition, in 2015, after years of separate environmental impact studies under NEPA, and consultation with numerous stakeholders, including the FWC, NPS adopted a separate Record of Decision for a General Management Plan (the "GMP ROD") in which NPS decided, among other things, to protect the Park's coral reefs and their ecosystems by creating, "as

2

soon as practicable," a marine reserve zone ("MRZ") to better protect a small area of the Park covering approximately 6% of the Park's waters. In that MRZ, "[r]ecreational and commercial fishing [would] be prohibited," but other activities, such as swimming, snorkeling, scuba diving and viewing the reefs from glass bottom boats, would be allowed. *Id*. ¶¶ 40, 48; *see generally id.* ¶¶ 36-47.

In the seven or more years since NPS made those decisions, however, NPS has implemented neither the phase out of commercial fishing nor the MRZ. *Id.* ¶¶ 48–51, 58; Answer, ECF No. 10, ¶¶ 58, 81. In this action, NPCA asserts that NPS has violated the Organic Act and 36 C.F.R. § 2.3(d)(4), among other things, and has acted arbitrarily and capriciously by failing to implement those decisions, or at least by unreasonably delaying doing so. Compl. ¶¶ 70–88. NPCA understands that years after the fishing and MRZ decisions were made, NPS—without notice and comment and without any other consultation with the public—executed an August 31, 2020 Memorandum of Understanding (the "2020 MOU") with the FWC, which had long opposed those two decisions and their implementation. In the 2020 MOU, NPS agreed with FWC (i) not to implement the MRZ unless and until NPS could show in further studies over a six-year period that "less restrictive management actions" would not suffice to protect the coral reefs and their ecosystems, and (ii) to regulate commercial fishing instead of phasing it out. *Id.* ¶¶ 3, 59–64, 76–79 and 88.

On June 2, 2021, the Defendants submitted their administrative record for this case, consisting of eighty documents. Defendants' Index of Administrative Record, ECF No. 20–2.

Notably for this failure to act case, however, only one of the eighty documents proffered by Defendants in the proposed administrative record relates to what happened to the MRZ and commercial fishing phase out decisions after they were made. That one document is a February

3

2020 letter from the Park's superintendent to NPCA's counsel.[1]  Defendants' administrative record provides context for the failure to act, but does not explain what the Defendants' were actually doing and why the decisions have not been implemented.

In an effort to resolve possible future disputes about the use of documents for the case, NPCA suggested to Defendants that the administrative record be expanded to include several relevant documents from previous Freedom of Information Act ("FOIA") productions that shed light on the failure to act central to the case.  *See* Rumsey Decl. ¶ 4.  Although Defendants agreed to include some of NPCA's proffered documents in the administrative record, Defendants objected to including the fourteen documents at issue here (the "disputed documents").[2]  In Defendants' view, these documents are "deliberative material" and therefore inappropriate for inclusion in the record.  *See* Rumsey Decl. ¶ 5.  Below is a brief description of each disputed document:

| Doc. Number | Date | Document Description |
|---|---|---|
| 1 | Oct. 31, 2014 | **An email from the NPS Regulations Program Specialist based in Washington, D.C. to the Park's Fishery and Wildlife Biologist** asking for assistance "put[ing] the finishing touches" on the briefing statement, communications plan, and regulatory alert for the proposed commercial fishing regulation.  This email demonstrates that in October 2014—less than four months after the FMP ROD was signed—NPS had made significant progress toward issuing a rule to implement the commercial fishing phase out.  Specifically, by that time the content of the rule was |

[1] In 2019, NPCA's counsel wrote the Park to express concern, not for the first time, that NPS had still not even proposed, much less adopted, regulations to implement the commercial fishing ban or create the MRZ.  AR # 1710.  The Park Superintendent's February 9, 2020 response ("2020 Park Letter") stated that, with the help of a regulation specialist from the NPS Washington, D.C. office, a special regulation had been drafted in or about 2014 to implement the phase out of commercial fishing.  AR # 1764.  The letter continued: "The Park submitted the draft rule to the NPS Washington, DC office, but has not received the authority to promulgate the new rules." AR # 1766.  As for the MRZ, the superintendent wrote that it was "highly contentious and politically charged."  AR # 1766.

[2] NPCA proposed the inclusion of an additional 67 documents to those certified on June 2, 2021. Defendants agreed to the inclusion of 20 of those documents, NPCA withdrew its proposal as to 33 of the documents, and 14 documents remain in dispute.

| Doc. Number | Date | Document Description |
|---|---|---|
|  |  | already sufficiently definitive so that they were working on plans for how to rollout the rule and for a communications strategy for the rule. |
| 2 | Feb. 20, 2015 | **A General Management Plan and Fishery Management Plan Fact Sheet.**  This fact sheet sets out the status of NPS' implementation of the GMP and FMP as of February 2015 and gives the anticipated timeline for completing the GMP and implementing the FMP.  Specifically, it explains that the FMP is intended to guide Biscayne for "the next five to ten years"—2014 to 2024—and that rulemaking was anticipated to begin in "early 2015." |
| 3 | Apr. 27, 2015 | **A draft commercial fishery phase out regulation for the Park.**  This draft regulation demonstrates that, as of April 2015, implementation of the FMP ROD had progressed to the point that there was a draft rule—needing only a publication date be inserted into it—ready to be published. |
| 4 | Oct. 23, 2015 | **An email chain between NPS employees regarding implementation of the GMP and the FMP.**  This email provides insight into the timeline of inaction on implementing the GMP and FMP.  As of October 2015, the FMP regulation had been "on hold for several months."  It also provides the status on what steps were necessary to move forward with implementing the FMP and GMP—briefing the Washington Area Support Office. |
| 5 | Mar. 4, 2016 | **An agenda for briefing the Interim Superintendent of the Park titled "General Management Plan/Fishery Management Plan and status."**  This document shows that by March 2016, NPS had made significant progress in drafting the commercial fishing phase out—that the "draft federal regulation [is] completed", as was the Economic Analysis in support of the regulation. |
| 6 | June 20, 2016 | **An email from the Park's Fishery and Wildlife Biologist to another NPS employee stating that as of June 2016,** "[t]he MRZ has not yet been implemented, as we are in the beginning stages of contracting out the Economic Analysis required as part of the rule-making process."  The email also lists key facts about the GMP process. |
| 7 | Sept. 1, 2016 | **An email chain between NPS employees regarding the commercial fishery phase out regulation and the MRZ regulation.**  The email merely states that the incoming Park Superintendent wanted to meet with the NPS Regulations Program Specialist to "get sorted out how we will move forward reg wise for Biscayne." |
| 8 | Sept. 12, 2016 | **An email chain between NPS employees about the cost of publishing the draft commercial fishery phase out regulation in the Federal Register.**  The budgetary discussion in this email chain shows that as of September 2016, the draft fishery phase out regulation was substantively complete such that the discussion focused on how much it cost to publish it. |
| 9 | June 21, 2017 | **An email from the outside consultant preparing the Economic Analysis to NPS attaching the final draft of the Economic Analysis of a Proposed Rule to Implement the GMP MRZ at the Park.**  In the email, the consultant recognizes that "publication of the proposed rule for |

| Doc. Number | Date | Document Description |
|---|---|---|
| | | implementation of the GMP … may not be imminent" and states that she will be "on hold until further notice from NPS." This email shows that although the MRZ regulation and supporting economic analysis had been prepared, there had been a slowdown in the push for implementation. |
| 10 | July 23, 2018 | **An email chain between the Park's Fishery and Wildlife Biologist and another NPS employee in June 2018 setting out the status of the MRZ.** The Park's Fishery and Wildlife Biologist says to "avoid all mention of the MRZ" that "any mention of it" had recently been removed from another report, and, if it must be mentioned, to "describe it as the MRZ proposed in past park planning efforts (or something to that extent to indicate that it is not actively on the table as something being considered). :( " |
| 11 | July 18, 2014 | **An email chain between the Park's Fishery and Wildlife Biologist and another NPS employee discussing that the FWC's edits to the 2014 MOU "almost sounds like we are agreeing to continue commercial fishing"** and suggests that it be edited to "add a sentence about the phaseout" of commercial fishing. As seen in Document 14, FWC edited the draft to remove the language about the phase out of commercial fishing. |
| 12 | Aug. 22, 2014 | **An email from the Park's Fishery and Wildlife Biologist to FWC transmitting a draft MOU for review.** The email states "[a]ttached is a first take at an MOU for rule-making related to the FMP." This email and attachment sent to FWC, an outside entity, lays out the terms NPS wished to have included in the 2014 MOU. |
| 13 | Aug. 22, 2014 | **A draft 2014 MOU transmitted in the August 22, 2014, email to FWC (Doc. 12).** The draft MOU includes language acknowledging that any commercial fishing would be "in accordance with the commercial [fishing] phase out as described in the [FMP]" and that "the NPS and FWC will pursue the long-term process of phasing out commercial fishing in Park waters." In addition, it states that "the FWC does not intend to implement a marine reserve (no-take area) in the waters of the Park unless both parties agree it is absolutely necessary." |
| 14 | Sept. 25, 2014 | **An email between NPS employees discussing the draft 2014 MOU.** In response to FWC's draft MOU, an NPS employee forwards the draft to two other NPS employees in which she highlights a conflict between NPS and FWC regarding the "marine reserve paragraph and the reference to commercial fishing." She then suggests that "as discussed, one possibility is not renewing the current MOU, letting it expire and stay on the record as currently written (even though expired), and just drafting a new MOU regarding the science/monitoring plan, with no reference to marine reserves or commercial fishing." |

### III.    ARGUMENT

**A.    The Court Should Consider the Documents Whether or Not they are Part of the Administrative Record and Irrespective of the Privilege Claim.**

As an overarching proposition, the fourteen documents should be considered by the Court whether or not they are part of the administrative record.  This case focuses on the agency's failure to implement two final decisions made pursuant to the Administrative Procedure Act.  This Court has recognized that there may be a need in "failure-to-act" cases to consider documents outside the administrative record.  *See Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138, 148–49 (D.D.C. 2020) (considering extra-record evidence in a failure-to-act case where the Government believes there was no final agency action); *Dall. Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 540 (D.D.C. 2021) (denying the plaintiffs' motion to take limited discovery, but "recognizing an exception to the bar on extra-record evidence including 'in the rare case in which the record is so bare as to frustrate effective judicial review.'").  Here, the Defendants in their proffered administrative record included only one document (AR # 1764, the 2020 Park Letter) that explains the reasons for Defendants' failure to implement the two final agency decisions.  Thus, it is apparent from the face of the Defendants' proposed record that the agency inaction is not adequately explained therein, thus potentially frustrating judicial review.

Indeed, the parties' difficulties in agreeing on a record underscores why limiting the scope of the relevant documents would be a mistake in this case.  The Defendants have characterized their proposed record as including "documents the agency-decision-makers have considered in the implementation process, without a firm decision end-date."  *See* Rumsey Decl. ¶ 6.  But in a failure-to-act case, it is important for the court to weigh not just the documents the agency has considered in failing to act, but the overall circumstances surrounding that failure.  Moreover, as

a technical matter, an administrative record is supposed to include all documents the agency has before it when a decision is made, yet Defendants have emphasized, with respect to their proposed record, that for the implementation, there is no "firm decision end-date."  *See* Rumsey Decl. ¶ 6. According to Defendants, while the 2020 MOU is a "decision", there has been no final decision here on the MRZ and commercial fishing ban and implementation is ongoing.  *Id.*  With no decision as to implementation, it is unclear why this case should be limited to record review.  *See Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59 (D.D.C. 2015) (an "administrative record" is defined as including "all materials compiled by the agency that were before [it] *at the time the decision was made*.") (emphasis added).  In short, this is a case in which the court's review cannot be "limited to the record as it existed at any single point in time, because [under the Defendants' view of the world] there is no final agency action to demarcate the limits of the record."[3]  *Democracy Forward Found.*, 474 F. Supp. 3d at 148–49.

It is also relevant that NPCA is not seeking discovery in this case.  *Cf. Gona v. U.S. Citizenship & Immigr. Servs.*, No. 1:20-CV-3680-RCL, 2021 WL 1226748, at *1–2 (D.D.C. Apr. 1, 2021) (permitting discovery for the plaintiff's unreasonable delay claim against USCIS in processing her visa application).  Instead, Plaintiff intends to proceed based on the Defendants' proposed administrative record as supplemented by the fourteen documents in dispute.[4]  Those documents can be made part of the administrative record or they can be considered to be extra-

---

[3] NPCA believes, and has asserted in its Complaint, that the 2020 MOU is final agency action. Compl.  ¶¶ 76–79; 88.  If the 2020 MOU constituted final agency action, then the documents are properly part of the record.  However, NPCA is arguing in the alternative that if there was no final agency action, as the government appears to be saying, then extra-record evidence is warranted to help inform the court of the agency's reasons for delaying/failing to act.

[4] The Defendants continue to produce documents in response to NPCA's FOIA request, and NPCA reserves the right to seek to use additional documents in the event it receives a document important to its case or necessary to rebut Defendants' arguments.

record evidence to help explain the initial actions taken by NPS towards implementation of the two final decisions at issue and then the undue delay that has since occurred.

Finally, the deliberative process privilege is not an absolute privilege, and a court may decide to disregard the privilege if the document is necessary for judicial review.[5]  *Dall. Safari Club*, 518 F. Supp. 3d at 540.  The determination of whether the privilege can be overcome by a sufficient showing of need is to be "made flexibly on a case-by-case, ad hoc basis."  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).  The D.C. Circuit held in *In re Sealed Case* that "each time [the deliberative process privilege] is asserted the district court must undertake a fresh balancing of the competing interests," considering "factors such as 'the relevance of the evidence,' 'the availability of other evidence,' 'the seriousness of the litigation,' 'the role of the government,' and the 'possibility of future timidity by government employees.'"  *Id*. at 737–38 (quoting *In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992)); *see also Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*, 110 F. Supp. 3d 215, 221 (D.D.C. 2015).  Here, given all the circumstances, including the weakness of the Government's privilege claim discussed below, and the plaintiffs' limited request, the documents should be made part of the record or otherwise considered irrespective of the privilege issue.

**B.    The Documents Should Not Be Withheld As Deliberative Materials.**

The deliberative process privilege is intended to keep confidential and shield from public disclosure pre-decisional documents that reflect the give and take of agency officials prior to

---

[5] To be clear, NPCA understands that Defendants are not asserting the deliberative process privilege over these documents.  Instead, Defendants' position is that these documents are "deliberative material" and therefore not appropriate for inclusion in the record under *Oceana, Inc. v. Locke*, 634 F. Supp. 2d 49, 53 (D.D.C. 2009), *rev'd on other grounds*, 670 F.3d 1238 (D.C. Cir. 2011).  However, as a practical matter, "courts in this District apply the deliberative process privilege test as used in Freedom of Information Act cases or common law privilege cases" in an administrative record context.  *See Stand Up for Cal.! v. U.S. Dep't of Interior*, 315 F. Supp. 3d 289, 298–99 (D.D.C. 2018).

reaching a final decision on agency action. *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). The "privilege is to be construed 'as narrowly as consistent with efficient [g]overnment operation.'" *U.S. Dep't of the Treas. v. Pension Benefit Guar. Corp.*, 222 F. Supp. 3d 38, 42 (D.D.C. 2016). The materials must be both pre-decisional and deliberative to be protected. *Judicial Watch v. U.S. Dep't. of Justice*, 20 F.4th 49, 54 (D.C. Cir. 2021). Whether a document is "pre-decisional" requires a temporal analysis and a determination of the relevant decision at issue. *Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 60 (D.D.C. 2014), *aff'd*, No. 15-5131, 2015 WL 9309920 (D.C. Cir. Dec. 4, 2015). The key question to determine if documents are deliberative "is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reps. v. Dep't of Justice.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (quoting *Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*, 815 F.2d 1565, 1567–68 (D.C. Cir. 1987)). Defendants bear the burden of establishing that the privilege applies here. *See U.S. Dep't of the Treas.*, 222 F. Supp. 3d at 41–42. In their explanations to the Plaintiff up to now, that burden has certainly not been met.

In Sections 1–3 below, we have summarized the document-by-document analysis in three points. In Section 4, we have set forth a document-by-document statement of why the deliberative process privilege does not apply to the fourteen documents in question.

> 1.    *Documents 1-14 are not pre-decisional and deliberative as to Defendants' failure to act.*

As discussed above, this case focuses not on how the agency reached its 2014 and 2015 decisions, but on Defendants' multi-year failure thereafter to implement the decisions without any public notice or explanation. *Id.* ¶¶ 71–79, 81–88. All of the documents in dispute relating to the phase out of commercial fishing were created after NPS signed the FMP ROD on July 10, 2014. *See* Exhibit 1 to the Rumsey Decl. Similarly, except for Document 2, all of the documents in

dispute relating to the MRZ were created after NPS signed the GMP ROD on August 31, 2015. *Id.* Except for Document 2, the analysis should end there, and the Court should find that none of these documents are protected by deliberative process privilege since they are not pre-decisional. *See, e.g., Citizens for Resp. & Ethics in Wash. v. U.S. Gen. Servs. Admin.*, 358 F. Supp. 3d 50, 53 (D.D.C. 2019) (finding that materials were post-decisional when they were prepared after a decision was made); *see, also, BuzzFeed, Inc. v. U.S. Dep't of Just.*, 419 F. Supp. 3d 69, 76 (D.D.C. 2019) (documents that "promulgate or implement an established policy of an agency" are not considered pre-decisional).

Furthermore, the disputed documents, including Document 2, are not deliberative on their face. None of the documents "expose 'recommendations,' 'suggestions,' and 'other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *In re United States*, 2017 WL 406243 at **4 (1st Cir. Jan. 30, 2017) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Instead, these documents reflect facts about what steps NPS took to implement the commercial fishing phase out and the MRZ, when those steps were taken, and when implementation steps ceased.

Documents 11–14 present a somewhat more complicated situation. NPS consulted with FWC, the relevant Florida agency, before and after the 2014 and 2015 decisions, but the two agencies had agreed to MOUs in the 2002 to 2012 time period before those decisions were made. The 2012 MOU expired in 2014, and the parties tried unsuccessfully to agree to a new MOU in 2014. Documents 11–14 relate to the NPS' decision not to renew an MOU with FWC in 2014, and they are important to Plaintiff's claims because they shed light on Defendants' failure to act in implementing the 2014 and 2015 decisions.

In 2020, NPS agreed to a new MOU with FWC.  In discussions with Plaintiff, Defendants have claimed that the four MOU documents are privileged because "any MOU-related document drafted before the signing of the [2020] MOU is necessarily pre-decisional."  *See* Rumsey Decl. ¶ 7.  But the decision as to which these documents relate is the decision not to renew an MOU with FWC in 2014, not a decision six years later to enter into a new MOU in 2020: "'[T]o approve exemption of a document as pre-decisional, a court must be able to pinpoint an agency decision or policy to which the document contributed.'"  *Hinckley v. United States*, 140 F.3d 277, 284 (D.C. Cir. 1998) (quoting *Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987)).

While documents 11–14 might once have been deliberative and pre-decisional regarding the 2014 decision, the documents lost their protection under the deliberative process privilege when the decision was made to not have a 2014 MOU.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (a document that may be pre-decisional at the time it was prepared may lose that status if the agency adopts it formally or informally as the agency's position on an issue).  If a document reflects discussion of a policy thereafter adopted, the document is no longer considered "deliberative," but is needed to understand the reasons for adoption.  Thus, there is no valid basis for withholding documents 11–14 as deliberative materials.

    2.    *NPS waived any privilege claim when it publicly released the documents under FOIA.*

Even if there were some validity to Defendants' privilege claim, all fourteen disputed documents were already produced by NPS to NPCA or another environmental group pursuant to FOIA.  For eleven of the documents, NPS made no assertion of deliberative process under FOIA exemption 5 when they were publicly released.  For the other 3 documents (Docs. 4, 7, and 9), NPS redacted portions of the document based on exemption 5, but otherwise released the materials.

(NPCA is not challenging the redactions made by NPS.)  NPS' conduct in releasing the documents under FOIA, particularly while asserting the deliberative privilege for certain passages, effectively waived any claim of deliberative material privilege for the remainder of the material.  The agency concluded that a FOIA release of all or most of the material was appropriate then; it cannot now assert that confidentiality is necessary for purposes of judicial review of its post-decision conduct.  The FOIA release demonstrates that there is "[no] legitimate governmental and private interests [that] could be harmed . . . . " by the inclusion of these documents in the administrative record.  *Citizens for Resp. in Ethics in Wash. v. U.S. Dep't of State*, 2022 WL 424965, at *2 (D.D.C. Feb. 11, 2022).  Stated briefly, with the FOIA release of the material, the horse was let out of the barn.

*3.    Correspondence with independent third parties cannot be privileged.*

Finally, NPS' casual overreach in claiming deliberative process is clear from the agency's attempt to assert the privilege even for 2 documents that are essentially correspondence between the federal agency and an outside entity, the FWC, a state agency that has entirely separate interests regarding the Park (Docs. 12 and 13).  NPS has failed to explain its rationale for asserting the privilege for these materials, but there is no legal basis for sweeping under the privilege written communications with separate third parties where each entity is pursuing its own, unaligned interests with regard to the subject matter of the material.  *See Lawyers' Comm, for Civil Rights Under Law v. U.S. Dep't. of Justice*, 2020 WL 7319365 (D.D.C. Oct. 16, 2020).

*4.    A document-by-document review confirms the foregoing points.*

We explain these points in the context of each of the fourteen disputed documents in the section below:

**Document 1** is an email from a NPS Regulations Program Specialist based in Washington, D.C. to the Park's Fishery and Wildlife Biologist asking for assistance "put[ing] the finishing touches" on the briefing statement, communications plan, and regulatory alert for the proposed

13

commercial fishing phase out regulation.  *See* Doc. 1.  This October 31, 2014 email is post-decisional to the July 10, 2014 FMP ROD.  The email is not deliberative because it does not delve into the substance and back and forth of the consultive process, but is just a request for assistance from the NPS Regulations Program Specialist, the NPS employee responsible for drafting the regulations.

**Document 2** is a GMP and FMP fact sheet.  *See* Doc. 2.  The February 20, 2015 fact sheet is post-decisional to the July 10, 2014 FMP ROD, but is pre-decisional to the August 31, 2015 GMP ROD.  The fact sheet is not deliberative because it is purely factual, as the name "fact sheet" indicates, and is describing the purpose, overview, proposed actions, partner participation, public engagement, and next steps for the GMP and FMP.

**Document 3** is a draft of the commercial fishing phase out regulation establishing a non-transferable lifetime permit system to phase out commercial fishing as decided in the FMP ROD.  *See* Doc. 3.  This April 26, 2015 document is post-decisional to the July 10, 2014 FMP ROD.  The draft regulation is not deliberative because it is enacting the policy decision the NPS already made in the FMP ROD to phase out commercial fishing.  The mere fact that it is a draft does not make it *per se* deliberative: "[T]he fact that a document is in draft form does not automatically cloak it with the deliberative process privilege. '[D]rafts are not presumptively privileged . . . .'" *U.S. Dep't of the Treas.*, 222 F. Supp. 3d at 43 (*quoting Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004)).

**Document 4** is a heavily redacted email chain between NPS employees regarding implementation of the GMP and the FMP.  *See* Doc. 4.  The October-December 2015 email chain is post-decisional to both the July 10, 2014 FMP ROD and the August 31, 2015 GMP ROD.  NPS

redacted the information it considered deliberative, marking it with (b)(5), so the remaining content is non-deliberative.

**Document 5** is an agenda for a briefing to the interim park superintendent, which addresses implementation of the FMP and GMP. *See* Doc. 5. The March 4, 2016 agenda is post-decisional to the July 10, 2014 FMP ROD and the August 31, 2015 GMP ROD. The agenda is not deliberative because it merely contains factual information about the current status of implementation efforts.

**Document 6** is an email from the Park's Fishery and Wildlife Biologist to another NPS employee providing input to a briefing statement for the proposed MRZ regulations. *See* Doc. 6. The June 20, 2016 email is post-decisional to the August 31, 2015 GMP ROD. The email is not deliberative because it does not direct whether to implement the MRZ, but rather describes the factual status of MRZ implementation.

**Document 7** is a partially-redacted email chain between NPS employees regarding both commercial fishing phase out and MRZ regulation. *See* Doc. 7. The August-September 2016 emails are post-decisional to both the July 10, 2014 FMP ROD and the August 31, 2015 GMP ROD. NPS redacted the information it considered deliberative, marking it with (b)(5), so the remaining content is non-deliberative.

**Document 8** is an email chain between NPS employees discussing the cost of publishing the draft commercial fishing phase out regulation in the Federal Register. *See* Doc. 8. The September 12, 2016 email chain is post-decisional to the July 10, 2014 FMP ROD. The email chain is not deliberative, as the discussion is about the budgetary implications of publishing in the Federal Register and does not contain recommendations or suggestions of what should go in the regulation.

**Document 9** is an email from an outside consultant to NPS employees, along with a partially redacted final draft of the Economic Analysis of a Proposed Rule to Implement the GMP at the Park. *See* Doc. 9. The June 21, 2017 email and economic analysis are post-decisional to the August 31, 2015 GMP ROD. NPS redacted the information it considered deliberative, marking it with (b)(5), so the remaining content is non-deliberative.

**Document 10** is an email chain between the Park's Fishery and Wildlife Biologist and another NPS employee discussing the commercial lobster data and how to address the MRZ in a map. *See* Doc. 10. The July 16–23, 2018 email chain is post-decisional to the August 31, 2015 GMP ROD. The email chain is not deliberative because the emails are stating the current factual status that the MRZ "is not actively on the table as something being considered."

**Document 11** is an email chain between the Park's Fishery and Wildlife Biologist and another NPS employee discussing edits to the 2014 MOU with FWC to reflect the FMP rulemaking process. *See* Doc. 11. The July 18, 2014 email chain may have been pre-decisional had the 2014 MOU been finalized, but it lost that status when the agency adopted formally its position to not have a 2014 MOU and let the 2012 MOU expire. The email chain is not deliberative, as the decision was already made in the July 10, 2014 FMP ROD to phase out commercial fishing, and discussion in the emails is about implementing that final action in the 2014 MOU.

**Document 12** is an email from the Park's Fishery and Wildlife Biologist to FWC transmitting a draft of the 2014 MOU. *See* Doc. 12. The August 22, 2014 email may have been pre-decisional had the 2014 MOU been finalized, but it lost that status when the agency adopted formally its position to not have a 2014 MOU and let the 2012 MOU expire. The email is not deliberative because it does not contain any suggestions or recommendations by the writer, but rather explains the document being transmitted. Additionally, the email is not deliberative because

NPS was transmitting a document that reflected NPS' position to FWC, an outside entity, which at the time was pursuing its own, unaligned interests.

Document 13 is the draft 2014 MOU that was attached to Document 12. *See* Doc. 13.  The document may have been pre-decisional had the 2014 MOU been finalized, but it lost that status when the agency adopted formally its position to not have a 2014 MOU and let the 2012 MOU expire.  The document is also not deliberative, because it reflected NPS' position and was sent to FWC, an outside entity with its own, unaligned interests.

Document 14 is an email between NPS employees discussing the draft 2014 MOU and edits of concern. *See* Doc. 14.  The September 25, 2014 email and draft document may have been pre-decisional had the 2014 MOU been finalized, but it lost that status when the agency adopted formally its position to not have a 2014 MOU and let the 2012 MOU expire.

## IV.    CONCLUSION

For the reasons stated above, NPCA respectfully requests that the Court order that the fourteen disputed documents be included in the administrative record or be otherwise considered as extra-record evidence.

**Dated**: March 1, 2022                    Respectfully submitted by,

Allison B. Rumsey (D.C. Bar No. 450475)
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave., NW
Washington, DC 20001
Tel.:  (202) 942-5095
Fax:  (202) 942-5999
allison.rumsey@arnoldporter.com

Paul Q. Andrews (appearance pro hac vice)
**Arnold & Porter Kaye Scholer LLP**
250 West 55th St.
New York, NY 10019
Tel.:  (212) 836-7173
Fax:  (212) 836-8689
paul.andrews@arnoldporter.com

*Counsel for Plaintiff National Parks
Conservation Association*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2022, I electronically filed the foregoing **PLAINTIFF'S MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF ITS MOTION TO ADD EXTRA-RECORD EVIDENCE OR TO ADD DOCUMENTS TO THE ADMINISTRATIVE RECORD** with the Clerk of Court using the CM/ECF system which will send notification of this filing to all counsel of record.