# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | : | | |
| | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-3706 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 41, 42 |
| | : | | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff National Parks Conservation Association ("NPCA") brings this action against the United States Department of the Interior, National Park Service ("NPS" or "Park Service"), the Secretary of the Interior, and the Director of the National Park Service (collectively, the "Defendants"), alleging that Defendants have unlawfully failed to take action to protect Biscayne National Park (the "Park") in Florida. Specifically, NPCA argues that after deciding to pursue a marine reserve zone and a commercial fishing phase-out within the Park, Defendants abandoned those decisions in violation of the NPS Organic Act ("Organic Act") and the Administrative Procedure Act ("APA"). NPCA invokes two different provisions of the APA: (1) under APA Section 706(2)(A), it argues that Defendants have behaved arbitrarily and capriciously by failing to explain their change in approach; (2) and under Section 706(1), it argues that Defendants have unlawfully delayed agency action. Defendants disagree, arguing with regard to the APA that (1) NPS has not taken a final agency action that can be challenged under Section 706(2)(A) and that

(2) NPS has no duty to implement the marine reserve zone and commercial fishing phase-out and cannot be compelled to take action under Section 706(1), and that even if NPS did have a duty, NPS has not impermissibly delayed those policies so as to warrant relief.  NPCA also seeks attorneys' fees for a Freedom of Information Act ("FOIA") request related to the Park, but Defendants object that NPCA is not eligible for those fees and that NPCA has not argued that it is entitled to fees.

For the reasons stated below, the Court agrees with NPCA that Defendants have impermissibly delayed the implementation of a marine reserve zone.  However, the Court also agrees with Defendants that NPCA has not identified a final agency action subject to arbitrary and capricious review, and that NPS has no duty to implement the phase-out of commercial fishing phase-out.  The Court also concludes that NPCA has adequately argued that it is eligible for FOIA attorneys' fees.  Thus, Plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' cross-motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.  BACKGROUND

### A.  NPS Organic Act and the National Environmental Policy Act

*a.  NPS Organic Act*

NPS is governed by the National Park Service Organic Act, 54 U.S.C. § 100101 *et seq*. The Organic Act establishes that the purpose of the National Park system is to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  *Id.*

*b.  National Environment Policy Act*[1]

Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370, and implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), agencies must consider every significant aspect of the environmental impact of a proposed action, explain its considerations of the environmental consequences, and publish its evaluation and preferred alternative, among other requirements, in an environmental impact statement ("EIS").  40 C.F.R. § 1502.1 *et seq*.  The agency must, upon making a decision as to its course of action, "prepare and timely publish a concise public record of decision," ("ROD") which shall "[s]tate the decision." *Id.* § 1505.2.

## B.  Biscayne National Park

Over fifty years ago, in 1968, Congress first recognized the need to protect Biscayne Bay when it established the nearly 100,000-acre Biscayne National Monument.  AR_2; AR_231.[2] Congress acted again in 1980 when it passed the Biscayne National Park Enabling Act ("Enabling Act"), 16 U.S.C § 410gg(1)–(5).  With land and waters donated by the state of Florida, the Enabling Act expanded Biscayne National Monument into the 173,000-acre Biscayne National Park "to preserve and protect for the education, inspiration, recreation, and enjoyment of present and future generations[,] a rare combination of terrestrial, marine, and amphibious life in a tropical setting of great natural beauty."  *Id.* at § 410gg; AR_966; AR_1004.

---

[1] This case does not arise under NEPA, but the Court provides this context here so that the reader may better understand the factual record and portions of the legal analysis.

[2] Reference to the administrative record are to the bates numbers printed on the top right of each page of the record, omitting leading zeroes.  Moreover, for clarity and in alignment with the practice of the parties, the Court will only use *id.* if the preceding citation refers to the same page of the administrative record.

Located just south of Miami, Florida, the Park's area is 95% water, making it "the largest marine park in the national park system."  AR_965; AR_367.  It consists "of mostly submerged land and includes coral reefs, sandy shoals, 4,825 acres of largely undeveloped mangrove shoreline, and 42 keys or islands primarily composed of limestone and coral."  AR_367.  The Park is "recognized for its natural resources, which represent a complex combination of terrestrial, marine, and amphibious wildlife species in a subtropical setting of great natural beauty."  AR_368.  Of all these natural features, the Park is best known for its coral reefs. AR_8; AR_1169 ("The park's coral reef is its signature feature.").  Visitors come to the Park "expect[ing] to see healthy coral reefs teeming with diverse communities of large, healthy fish." AR_965.  For these visitors, the Park's recreational opportunities include "snorkeling, scuba diving, paddling, bird-watching, [and] nature viewing."  AR_368.

Other visitors, however, are interested in more than observation.  Those seeking to enjoy themselves in the park may partake in "recreational fishing."  AR_368.  And then there are those who engage in commercial fishing.  AR_535.  The Enabling Act provides that the Park has two statutory management zones.  *See* AR_376 (map of the two zones); *see also* 16 U.S.C. § 410gg– 2.  In the first zone, comprising the original area of the national monument, NPS has regulatory authority over fishing.  16 U.S.C. § 410gg–2; *see also* AR_26–27.  In the second zone, comprising the areas donated by Florida after the Enabling Act's enactment, "fishing shall be in conformance with State law," 16 U.S.C. § 410gg–2, which NPS has interpreted to mean that it does not have authority to regulate fishing more strictly than the State within the Expansion Area, *see* AR_27.  In light of this statutory scheme, "[h]istorically, the NPS has chosen to primarily follow State of Florida fishing regulations within all BISC, and recreational and commercial fisheries have occurred in BISC waters since its founding."  AR_8.  Nonetheless,

NPS has *also* observed that commercial fishing is illegal within national parks unless it has been specifically authorized by Congress, *see* 36 C.F.R. § 2.3(d)(4), and that Congress has not specifically authorized commercial fishing in the Park, AR_535.  Thus, although NPS acknowledges commercial fishing is illegal in the Park, it has continued as a widespread practice for decades.  *Id.*

In fact, the Park is not doing well, and commercial fishing is part of the reason why.  The Park's famous coral reefs "have been in decline . . . , due in large part to . . . fishing pressure and vessel groundings as well as a number of factors outside the control of marine park managers such as climate change [ ] and disease."  AR_965.  "Biscayne's reef shows dramatic losses of living coral, from approximately 28 percent coverage three decades ago to only five to eight percent today."  AR_1170.  That trend of coral-loss looks to continue, as the "approximately 6% of Biscayne's reefs that remain alive continue to be under stress from derelict fishing gear, warming seas, and the absence of a stable healthy ecological food web resulting from overfishing."  AR_1980.  Moreover, "increases in South Florida's boating and fishing population combined with improved fishing and boating technology pose a threat to the long-term sustainability of the fishery-related resources" of the Park.  AR_7.

NPS currently manages the Park through the 2015 General Management Plan ("GMP") and 2014 Fisheries Management Plan ("FMP").  The GMP is the "basic document for managing Biscayne National Park for the next 15 to 20 years."  AR_369.  It is intended to "provide a vision for the park's future," *id.*, articulating "current values and strategies for making management decisions regarding natural and cultural resources and visitor experience," *id.*  The FMP "serve[s] hierarchically under the park's General Management Plan."  AR_10.  The FMP is focused on "ecosystem management solely as it pertains to fisheries."  AR_35.

Both plans were the culmination of over a decade's work, beginning in 2001.  AR_809; AR_1169.  After extensive public comment, NPS produced a first draft of the GMP in 2011.  AR_386; AR_1335.  This initial draft generated significant public interest, and "[d]uring the August 2011 public comment period, approximately 18,000 pieces of correspondence were received and more than 300 people attended three public meetings."  AR_349.  In response to those comments, including concerns raised by the State of Florida and other stakeholders, NPS published a supplemental draft in 2013.  AR_349–50.  It, too, generated significant interest: "approximately 14,000 pieces of correspondence were received containing 1,800 comments" on the 2013 draft.  AR_367; *see also* AR_1336.  Eventually, after fourteen years of planning, 30 public meetings, and more than 107,000 written comments in total, NPS finalized the GMP's EIS in April 2015.  *See* AR_345; AR_1170; AR_1898.

Unlike the GMP, NPS drafted the FMP in coordination with the Florida Fish and Wildlife Conservation Commission ("FWC"), which also regulates within the Park.  AR_311.  In 2002, 2007, and 2012, NPS entered into several Memoranda of Understanding with the FWC to formalize the cooperative relationship in managing the Park's fisheries.  AR_328.  NPS published a draft FMP in 2009 for public comment, AR_326, and published the final FMP EIS in May 2014.  AR_5.  Because the GMP and FMP each include specific policies that are at issue in this action, the Court will now describe these in turn.

### a. The GMP and the Marine Reserve Zone

The GMP EIS evaluated eight potential alternatives for managing resource use and visitation in the Park.  AR_434–528.  NPS concluded that if it did not take action and depart from existing policy, the "impacts on park fishery resources and fish habitat caused by boating and fishing in the park would continue to be adverse, minor to moderate, and long term."

AR_618.  It further found that "[e]xisting moderate or major adverse impacts to fishery resources, federally listed sea turtles, smalltooth sawfish, and stony corals, submerged aquatic communities, and natural soundscapes would be expected to continue."  AR_637.

The Park Service decided to depart from the status quo.  Faced with these concerns, a particular point of contention was whether NPS should create a marine reserve zone (the "Marine Reserve Zone" or for short, "MRZ") where certain human activities would be prohibited within the Park.[3]  AR_347.  Of the possible alternatives, NPS selected Alternative 8 and signed a ROD under NEPA on August 31, 2015.  AR_1315; AR_1318.  Among many other policy changes and management strategies for the Park, Alternative 8 included a Marine Reserve Zone that would encompass "about 6% of the waters of the [P]ark."  AR_1322.  "[A]fter 15 years of planning, scientific review, and input from the public and partner agencies, the NPS determined that implementing a marine reserve zone is the proper course of action."  AR_1895.  NPS envisioned that "[r]ecreational and commercial fishing will be prohibited" in the Marine Reserve Zone, while other activities such as swimming, snorkeling, scuba diving, and viewing the reefs from glass bottom boats, would be allowed.  AR_1322.  The Marine Reserve Zone would "provide snorkelers and divers with the opportunity to experience a healthy, natural coral reef, with larger and more numerous tropical reef fish and an ecologically intact reef system."  AR_965.  A reduced amount of "marine debris" such as fishing traps, nets, and line, and other "contaminants" would also enhance the experience for visitors.  AR_974.

The Marine Reserve Zone would have "long-term beneficial impacts on submerged aquatic communities."  AR_782; AR_1341.  With regard to coral reefs, NPS concluded that the

---

[3] The parties often refer to the Marine Reserve Zone as the "MRZ."  Given the many initialisms present in this decision, the Court will generally use the spelled-out form to enhance readability.

"adverse impacts on the reef from boating and fishing activities would be significantly reduced [by establishment of the Marine Reserve Zone] . . . [and] the potential for scarring, coral breakage or damage, from boat propellers, vessel groundings and anchor damage would be greatly reduced."  AR_781.  The Marine Reserve Zone would also improve conditions for the fish population in the Park, allow "the recovery of fish species/stocks" and "provide sufficient protection for the ecosystems they encompass."  AR_772.  NPS noted that "[m]arine scientists the world over agree that the most effective tool for marine ecosystem repair is an MRZ." AR_1170.

NPS also identified the precise boundaries of the Marine Reserve Zone.  After holding mapping workshops with the public, AR_1335–36, and consulting with other state and federal agencies, AR_813–18, the final GMP EIS specified the location of the Marine Reserve Zone as "between Hawk Channel and the park's eastern boundary, extending from Pacific Reef north to Long Reef (10,502 acres)."  AR_487–88; AR_491 (depicting the Marine Reserve Zone's area on a map of the Park).  NPS picked this location "in part, because [it] include[d] a variety of reef types for visitors to experience, existing markers that could serve as boundary markers, living coral cover, documented fish use by targeted fish species, and some of the Maritime Heritage Trail shipwrecks that visitors enjoy snorkeling and diving on."  AR_969–70.  This area also fell within the former boundaries of the National Monument, giving NPS authority to protect the Park's resources even if Florida preferred a different approach.  AR_966.

Finally, NPS set out the next steps regarding the Marine Reserve Zone.  In August 2015, NPS's GMP ROD directed that the Marine Reserve Zone should be instituted "[a]s soon as practicable after the publication of the Notice of Availability and Summary of the Record of Decision in the Federal Register."  AR_1323.

### b. The FMP and Commercial Fishing Phase-Out

The FMP EIS evaluated five alternative plans for managing the fisheries in the Park, including a plan to take no further action.  AR_41.  NPS concluded that taking no action "would likely result in further degradation of park fishery resources," AR_54, which would "likely have a major, long term negative impact, and could potentially lead to impairment," AR_ 80; AR_92.  Inaction would also "likely have a moderate, long-term negative impact" on the Park's coral reefs and on visitor experience of the Park.  AR_104; AR_125.

Rather than take no action, NPS adopted Alternative 4—with a "focus on rebuilding and conserving park fisheries resources"—as its "preferred alternative" in the FMP ROD under NEPA signed on July 9, 2014.  AR_50; AR_309; AR_320.  Alternative 4, "focuses on Desired Future Conditions (DFCs) of the park's fisheries resources and *not* on the exact management actions to be implemented."  AR_312 (emphasis in original).  The FMP Desired Future Conditions are to increase the size and abundance of targeted fish species by 20% in the Park and in adjacent waters.  *Id.*  To help achieve these conditions, and along with other policies, Alternative 4 envisioned that NPS would pursue a commercial fishing phase-out in the Park.  AR_312; AR_313.  More specifically, commercial fishers would be required to obtain "permanently non-transferable" special use permits that would expire unless renewed each year.  AR_50.  Over time, these permits would decrease in number, "leading to no commercial fishing" in the Park.  AR_51.

Because commercial fishing was already prohibited in the Park pursuant to 36 C.F.R. § 2.3(d)(4), NPS planned to implement these limitations on commercial fishing with a special regulation applying only to the Park.  AR_45.  In 2014, NPS began drafting this regulation, AR_1766.  By 2016, the draft rule to phase-out fishing and the economic analysis supporting the

regulation were complete, and  NPS expected that implementation of the federal regulation would take 18 months.  AR_1990.

   c.  *NPS Does Not Pursue the Marine Reserve Zone or Commercial Fishing Phase-out, Instead Signs 2020 Memorandum of Understanding*

       Despite NPS's conclusions in the GMP and FMP RODs, NPS did not immediately follow through on implementing the Marine Reserve Zone or the commercial fishing phase-out, with no action through 2018.  And in September 2018, then-Secretary of the Interior Ryan Zinke issued a memorandum expressing the view that States had "primary authority" to regulate fish and wildlife on public lands and committing the Department of the Interior "to defer to the States" for fish and wildlife management.  AR_1902–03.  This memorandum mirrored existing federal statutory and regulatory provisions that generally specify state regulation is the appropriate backdrop for fish and wildlife management.  *Id.*

       Florida responded to this memorandum stating that it was "excited about the prospect of avoiding the implementation of a MRZ."  AR_1904.  Indeed, the Marine Reserve Zone had proven controversial both before and after NPS decided to pursue it in the GMP.  Although more than 90% of public comments during the development of the GMP supported the Marine Reserve Zone, AR_1472–73, it encountered "fierce opposition from the State of Florida and House Republicans," AR_1405.

       Moreover, in 2020, NPS executed a Memorandum of Understanding (the "MOU") with Florida's FWC.  AR_1849.  This MOU pertains to the FMP and is similar in kind to previous MOUs governing the relationship between NPS and FWC.  The MOU sought to "improv[e] communication, cooperation and coordination between the Florida Fish and Wildlife Conservation Commission … and the Park."  *Id.*  At the core of the MOU's substantive provisions is an agreement to facilitate the creation of a science plan for joint monitoring by NPS

10

and FWC of fisheries health.  AR_1851.  This science plan focuses on identifying where the FMP's Desired Future Conditions benchmarks are not being met, and what further management actions may be needed to achieve those goals.  AR_1774.

Furthermore, in the MOU, NPS committed "to seek the least restrictive management actions necessary to fully achieve the Fishery Management Plan's mutual management goals for the fishery resources of the Park and adjoining areas." AR_1850.  The MOU continues on to note that "both parties recognize the FWC's position that marine reserves (no-take areas) are overly restrictive and acknowledge that the FWC does not intend to implement a marine reserve (no-take area) in Park waters as part of the Fishery Management Plan." AR_1850–51.  According to the MOU, "FWC and the Park agree that properly regulated fishing will continue within the boundaries of the Park," AR_1850, and  "FWC and the Park recognize and acknowledge that commercial and recreational fishing constitutes activities of statewide importance that benefit the health and welfare of the people of the State of Florida," *id.*  The Park "acknowledge[s] that the FWC will continue to play a crucial role in promulgating and implementing new regulations as deemed necessary to achieve the mutual fishery management objectives within the boundaries of the Park for the term of this MOU." AR_1854.

Nevertheless, the MOU also contains language that left room for flexibility and disagreement between the agencies.  It provides that "the agencies agree to consult with each other on any additional actions they may propose to conserve or protect fish populations and other aquatic resources within Park boundaries or to further regulate the fisheries." *Id.* Moreover, the MOU "recognize[s]" that:

> there may be times when the missions of the FWC and the Park may differ, and that while efforts will be made to the maximum extent possible to cooperate fully and jointly manage fishing within the Park as intended by Congress when the Park was established, there may be occasion when the two agencies choose to

> disagree.  Such occasions will not be construed as impasses and every attempt
> will be made to avoid communication barriers and to not jeopardize future
> working relationships.

AR_1855.  Similarly, the MOU emphasizes that its language "is not intended to preclude implementation of additional or more restrictive management measures within the Park than in adjacent State waters as a means of achieving mutual objectives."  AR_1850.

The MOU has a term of five years and may be extended for an additional one to five years.  AR_1857.  It specifies that "[e]ither party may terminate this MOU by providing 60 days advance written notice to the other party."  AR_1858.  It also noted that any "disputes that may arise" from the MOU shall be subject to negotiation, and that if the parties cannot resolve a dispute, they may agree to mediation.  AR_1859.  Finally, "[i]f the dispute cannot be resolved through mediation, it will be elevated to a third party acceptable to both the Park and FWC for a final decision."  *Id.*

### d.  NPS Still Has Not Implemented the Marine Reserve Zone or Commercial Fishing Phase-out

NPS has taken action to address some parts of the GMP and FMP, and the Court does not attempt to present an exhaustive list of which measures have been implemented.  But for example, the Park has worked with FWC to adapt new regulations intended to achieve the FMPs, including limitations on the size of fish that can be harvested, AR_1843, Park-specific fishing bag limits, AR_1844, the establishment of Coral Reef Protection Areas where certain species cannot be taken and where traps cannot be deployed, AR_1844–1845, size limits on reef fish that can be caught, AR_1845, and establishing no-trawl zones to prevent shrimp trawling in sensitive areas, AR_1846.  In addition, in 2023, NPS decided to install 40–60 boat mooring buoys within the area where the Marine Reserve Zone was supposed to be established.  AR_2057–58.  Vessels could use these buoys instead of anchoring on the coral reef itself, but commercial fishing would still be allowed.  *Id.*

Despite these miscellaneous regulations, as of 2024, NPS still has not implemented the Marine Reserve Zone or the commercial fishing phase-out.  It has not promulgated draft regulations for public comment.  And conditions in the Park have continued to deteriorate.  In March 2020, NPS posted online that "the coral reefs' continued decline is accelerating and that live coral cover at two reefs in the southern portion of the Biscayne . . . has declined drastically in the last few years."  AR_1908.  And a survey conducted as part of the 2023 mooring buoy project described portions of the coral reef as "dirty," "filthy," and containing "lots of dead boulder corals."  AR_2058.

### C.  NPCA's FOIA Request

On April 2020, NPCA's counsel Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") mailed a hard copy FOIA request to NPS.  Declaration of Darrel Pae ("Pae Decl.") ¶ 2, Pl.'s Ex. 1, ECF No. 41-4.  On June 2, 2020, Arnold & Porter inquired why NPS had not acknowledged the request and NPS responded that its FOIA office was not receiving hard copy requests "because of the COVID-19 pandemic."  *Id.* ¶ 4.  The following day, Arnold & Porter resubmitted the request through an online portal.  *Id.*  NPS confirmed receipt on June 5, 2020.  *Id.*

According to NPS's FOIA officer for NPCA's request, Dr. Charis Wilson, NPS follows a "first in first out" approach to FOIA requests.  *See* Declaration of Charis Wilson ("Wilson Decl.") ¶ 7, ECF No. 42-2.  When Arnold & Porter made its FOIA request, NPS was inundated by other FOIA requests related to protests surrounding the death of George Floyd.  *Id*. ¶ 10 (noting that between June 1 and June 5, 2020 alone, NPS received fifty FOIA requests).  Dr. Wilson was also the only FOIA officer servicing NPS's main FOIA office and Washington, D.C. office.  *Id.*

On August 24, 2020, Arnold & Porter followed up on the status of the request, and Dr. Wilson responded that "the request [i]s still in the normal processing track and that there [a]re 3 expedited, 12 simple, and 85 normal requests ahead of" this request in the "processing queue." *Id.* ¶ 15.  Arnold & Porter followed up again, and on September 22, 2020,  received a similar response about the number of requests ahead in the processing queue.  *Id.* ¶ 17.  Arnold & Porter once more asked about the status of the request, and on November 17, 2020, were again told the number of requests ahead in the queue.  *Id.* ¶ 8.  This time, however, Dr. Wilson also informed Arnold & Porter that she had "received some potentially responsive records but am waiting on additional records from several custodians in several offices."  Pae Decl., Ex. G at 1, ECF No. 41-9.  Dr. Wilson also suggested that "[o]ne way to expedite the processing of this request" would be for Arnold & Porter to modify the scope of the request to emails containing specific terms that had been sent or received by specific custodians.  *Id.*; Wilson Decl. ¶ 19.  Arnold & Porter did not respond to this request.

In December 2020, NPCA filed this lawsuit with a count seeking to compel NPS to comply with its FOIA request.  Pae Decl. ¶ 8; Complaint ¶¶ 89–94, ECF No. 1.  On February 8, 2021, Dr. Wilson "advised the [Department of the Interior] attorney assigned to this litigation that as of that date there were 2 expedited, 8 simple, and 61 normal requests ahead of this request."  Wilson Decl. ¶ 22.  On February 19, 2021, NPS counsel handling the FOIA claim informed NPCA's counsel that the agency was preparing to make a production in the next three weeks.  Pae Decl. ¶ 9.  On March 9, 2021 Dr. Wilson advised a Department of the Interior attorney assigned to the matter that she had "not yet been able to begin reviewing the potentially responsive records, as [she] had several other litigations ahead of this one in my processing queue" but she further "suggested that [she] could commit to reviewing 500 pages per month."

Wilson Decl. ¶ 25.  On March 21, 2021, Arnold & Porter offered to narrow the request if it would expedite production, and the following week sent over a proposed narrowed request.  Pae Decl. ¶ 11.  On March 31, 2021, Arnold & Porter asked NPS counsel whether the narrower request would speed up production, and NPS counsel said that it forwarded the narrower request onward.  *Id.*  That same day, Arnold & Porter received NPS's first interim response to the request.  *Id.* ¶ 13.  By June 2021, Dr. Wilson "advised the Assistant U.S. Attorney . . .  assigned to this matter, that this request was now first in [her] litigation processing queue."  Wilson Decl. ¶ 30.  Arnold & Porter received another interim response on August 19, 2021.  Pae Decl. ¶ 13.

On October 12, 2021, NPCA moved for an order from the Court compelling NPS to prioritize review and production of documents from John Calhoun and Ben West and to produce responsive documents from these custodians by December 3, 2021.  *See* Pl.'s Mot. for Order Facilitating Resolution of Disputes as to the Administrative Record at 1, ECF No. 24. Defendants opposed the motion.  *See* Defs.' Mem. Opp'n Mot. Facilitating Resolution of Disputes as to the Administrative Record, ECF No. 25.  In a December 3, 2021 Joint Status Report, NPCA withdrew its motion because it had received partially responsive documents and a commitment that the remaining documents sought through the motion would be produced by January 7, 2022.  *See* Joint Status Report at 3*,* ECF No. 28.

NPCA received additional interim responses from NPS on January 7, 2022, February 28, 2022, May 23, 2022, June 6, 2022, and July 1, 2022.  Pae Decl. ¶ 15.  On November 8, 2022, Dr. Wilson sent the final FOIA response to NPCA counsel.  *Id.*  In total, NPS released 4,718 pages of responsive material, withholding certain information under FOIA Exemptions 5 and 6. Wilson Decl.  ¶ 52.  NPCA did not challenge the scope of the agency's search or withholdings. *Id.* ¶ 50.

### D.  Procedural History

NPCA filed the complaint in this action on December 17, 2020, alleging that Defendants'
actions and inaction regarding the Marine Reserve Zone and commercial fishing phase-out
violated the APA, the Park's Organic Act, and 36 C.F.R. § 2.3.  *See generally* Compl.  First,
according to NPCA, NPS's entry into the 2020 MOU with the FWC was an arbitrary and
capricious final agency action, in violation of APA Section 706(2)(A), because the agency
abandoned or at least substantially delayed implementation of the Marine Reserve Zone and the
commercial fishing phase-out.  *Id.* ¶¶ 78, 88.  Second, NPCA alleges that NPS has unreasonably
delayed implementation of the Marine Reserve Zone and commercial fishing phaseout, in
violation of APA Section 706(1).  *Id.* ¶¶ 78, 88.  Third, as discussed above, NPCA sought to
compel compliance with its FOIA request.  *Id.* ¶¶ 89–94.

The parties have now both moved for summary judgment.  *See* Pl.'s Mem. Law Supp.
Mot. Summ. J. ("Pl.'s Mot."), ECF No. 41-1; Defs.' Mem. Supp. Cross-Motion Summ. J. &
Resp. Opp'n Pl,'s Mot. Summ. J. ("Defs.' Mot."), ECF No. 42-1; Pl.'s Opp'n Defs.' Mot. Summ.
J & Reply Supp. Mot. Summ. J. ("Pl.'s Reply"), ECF No. 45, Defs.' Reply. Supp. Combined
Cross-Motion Summ. J. ("Defs.' Reply"), ECF No. 47.  Because NPCA's FOIA request has been
fulfilled, NPCA now asks the Court to declare that it "substantially prevailed" in its FOIA
litigation and that it is therefore eligible to recover attorneys' fees and costs.  Pl.'s Mot. at 38.
The motions are now ripe for decision by the Court.

### III.  LEGAL STANDARD

#### 1.  Summary Judgment and the APA

In a typical case, a court may grant summary judgment to a movant who "shows that
there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). But when assessing administrative action, at the summary judgment stage "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), limited to determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision, *Citizens for Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013). "In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 93 (D.D.C. 2020).

Under Section 706(2)(A) of the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Moreover, a change in policy or decision is arbitrary and capricious if the agency fails to "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Under Section 706(1) of the APA, courts may "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  When a party asserts a failure to act under APA Section 706(1), the claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*") (emphasis in original).  "The limitation to discrete agency action precludes . . . broad programmatic attack[s,]" *id.* at 64, while "[t]he limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law[,]" *id.* at 65.  Further, relief pursuant to Section 706(1) is only appropriate if it is consistent with the six-factor inquiry set forth by the D.C. Circuit in *Telecomm. Research and Action Ctr. v. F.C.C.*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*").

## 2.  FOIA Attorneys' Fees

A FOIA plaintiff who "substantially prevails" may obtain its attorneys' fees and costs.  5 U.S.C. § 552(a)(4)(E)(i).  A plaintiff has "substantially prevailed" if it obtains "a judicial order, or an enforceable written agreement or consent decree" or when there is "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial."  *Id.* § 552(a)(4)(E)(ii)(I)-(II).

## IV.  ANALYSIS

To start, the Court will explain the order in which it addresses the parties' arguments. NPCA has divided its APA claims regarding the Marine Reserve Zone and the commercial fishing phase-out into Count I and Count II, respectively.  Within those Counts, "[NPCA] asserts each APA claim under both Section 706(2)(A) based upon an alleged arbitrary and capricious change in policy and Section 706(1) based upon an alleged failure to act."  Defs.' Mot. at 8.  The parties at times interweave NPCA's APA Section 706(1) and 706(2)(A) challenges together in

their briefing, but it bears emphasis that these claims are analytically distinct.  As explained above, a Section 706(1) claim concerns agency action that has been unreasonably delayed, while a Section 706(2)(A) claim challenges a final agency action that has been taken.  What blurs the issues here is that NPCA's Section 706(2)(A) claim challenges an NPS agency action—the entry into the 2020 MOU—to the extent it allegedly finalizes that NPS will follow an approach of inaction.  *See* Compl. ¶¶ 76, 78.  In other words, both claims involve similar questions about NPS's alleged failure to act.  Likewise, the Section 706(1) and Section 706(2)(A) claims both concern the same factual issues pertaining to the Marine Reserve Zone and commercial fishing phase-out.

APA Sections 706(1) and 706(2)(A) have different legal frameworks that justify granting relief only when specific criteria are met, so it makes the most sense to tackle the claims by APA section rather than by whether they concern the Marine Reserve Zone or the commercial fishing phase-out.  Further, because NPCA's Section 706(2)(A) claims assert that what NPS has already done is impermissible, it is better to resolve that question before deciding whether NPS must be compelled to do anything else under Section 706(1).  Put another way, while the APA claims are not formally dependent on one another, the Court's analysis regarding Section 706(2)(A) is analytically cleaner as an antecedent to the Court's review of Section 706(1) than the other way around.

Another wrinkle is that NPCA asserts violations of the NPS Organic Act and NPS regulations without making it entirely clear how these contentions intersect with its Section 706(2)(A) and Section 706(1) claims.  *See, e.g.,* Pl.'s Mot. at 17–27.  Defendants comment that NPCA "does not identify whether [the Organic Act] claim is a 'failure to act' or 'arbitrary and capricious action' claim; nor does it identify which count of the complaint it relates to."  Defs.'

Mot. at 16.  As the Court reads NPCA's complaint and briefing, the answer is all of the above.
NPCA uses the Organic Act as a basis for both APA claims, and of course, both APA claims
concern the Marine Reserve Zone as well as the commercial fishing phase-out.  Specifically, in
addition to arguing that NPS has changed positions without an explanation in violation of
Section 706(2)(A), NPCA argues that NPS's failure to abide by the Organic Act also violates
Section 706(2)(A).  Separately, NPCA contends that the Organic Act imposes a duty on NPS to
act in the Section 706(1) context.  *See* Pl.'s Mot. at 20, 32–38.

   Lastly, NPCA also alleges that NPS has violated 36 C.F.R. § 2.3, which prohibits
commercial fishing in national parks unless specifically authorized by Congress.  *Id.* at 31.  This
argument, too, is reflected in both the Section 706(1) and Section 706(2)(A) claims.

   With that background, the Court proceeds in three parts.  First, it assesses NPCA's
argument that NPS has violated Section 706(2)(A) by changing positions without a reasoned
explanation and through inconsistency with the Organic Act.  Agreeing with Defendants, the
Court concludes that NPCA has not identified a final agency action that can be challenged under
Section 706(2)(A).  Accordingly, the Court will not resolve any of NPCA's remaining arguments
that NPS behaved in an arbitrary and capricious manner.  Second, the Court turns to NPCA's
argument that NPS has impermissibly delayed the implementation of the Marine Reserve Zone
and commercial fishing phase-out in violation of Section 706(1).  With respect to that argument,
the Court concludes that the Organic Act and NPS's RODs created a duty to promulgate a
regulation establishing the Marine Reserve Zone but did not create such a duty for the
commercial fishing phase-out.  Having reached that conclusion, the Court then determines that
considering NPS's substantial delay, it is appropriate to order NPS to follow through on its
commitment to create a Marine Reserve Zone.  Third, and finally, the Court finds NPCA has

shown that it is eligible to receive attorneys' fees as a substantially prevailing party in its FOIA

request litigation.  Because NPCA has not yet argued that it is entitled to fees, which is the

second prong of the FOIA test, the Court does not award fees.

### A.  NPCA Has Not Identified a Final Agency Action, Foreclosing its Section 706(2)(A) Claims

An agency decision must not be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "To make this finding the court

must consider whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park,* 401 U.S.

at 416.  The arbitrary and capricious standard of review is "very deferential," *Rural Cellular*

*Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), and the Court must "generally defer to the

wisdom of the agency as long as the action is supported by 'reasoned decisionmaking,'" *Bean v.*

*Perdue*, No. 17-cv-0140, 2017 WL 4005603, at *5 (D.D.C. Sept. 11, 2017) (quoting *Fox v.*

*Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)).

Furthermore, "[a]gencies are free to change their existing policies as long as they provide

a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. at 221.

When an agency makes such a change, it must "display awareness that it is changing position"

and "show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 515 (2009).  Indeed, an "'[u]nexplained inconsistency' in agency policy is 'a

reason for holding [a new agency action] to be an arbitrary and capricious change from agency

practice.'"  *Encino Motorcars, LLC*, 579 U.S. at 22 (quoting *Nat'l Cable & Telecomm. Ass'n v.*

*Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).  "In such cases it is not that further

justification is demanded by the mere fact of policy change; but that a reasoned explanation is

needed for disregarding facts and circumstances that underlay or were engendered by the prior

policy." *Fox Television Stations*, 556 U.S. at 515–16.  "As the Supreme Court has said, 'the Government should turn square corners in dealing with the people.'" *GPA Midstream Ass'n v. United States Dep't of Transp.*, 67 F.4th 1188, 1202 (D.C. Cir. 2023) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020)).

None of that framework matters, however, if APA Section 706(2)(A) does not apply in the first place.  The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  An agency action is "final if two independent conditions are met: (1) the action 'mark[s] the consummation of the agency's decisionmaking process' and is not 'of a merely tentative or interlocutory nature;' and (2) it is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  "An [action] must satisfy both prongs of the *Bennett* test to be considered final."[4]  *Id.* (quoting *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016)).

The insurmountable hurdle for NPCA's Section 706(2)(A) claims is that it has not identified an agency action that satisfies the first prong of *Bennett*, and so there has been no final agency action that the Court can review.  NPCA's briefing mostly focuses on what NPS *has*

---

[4] Additionally, "inaction may represent effectively final agency action that the agency has not frankly acknowledged." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987).  When "administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Id.* (quoting *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970)).  While this language is reminiscent of many of NPCA's arguments about inaction, the Court does not understand NPCA to argue that Section 706(2)(A) review is appropriate for this reason.

*failed to do*, rather than what NPS has done.  Rather than identifying a plan, order, or regulation spelling out that NPS will no longer pursue the Marine Zone Reserve or commercial fishing phase-out, NPCA argues that the 2020 Memorandum of Understanding is a final agency action evincing that decision.  *See, e.g.,* Compl. ¶ 76.  Defendants disagree, saying that NPS continues to consider the relevant policies and that the MOU is merely an agreement to facilitate cooperation between NPS and FWC.  *See* Defs.' Mot. at 13.  Upon review of the MOU's terms and the context in which NPS and FWC agreed to the MOU, the Court shares NPCA's skepticism that NPS still intends to implement the Marine Reserve Zone or commercial fishing phase-out.  But even if it is true that NPS has in fact decided to turn away from those policies, the Court requires evidence on that point, and it would be a leap too far to identify the MOU itself as the "consummation" of NPS's decisionmaking process.  And there is no other evidence in the record that shows that NPS has definitively decided not to proceed.

To start, NPCA's central theme on final agency action is simple: a decade ago, NPS emphasized the need for a Marine Reserve Zone and commercial fishing phase-out, but neither has happened.  More precisely, in 2014 and 2015, NPS revised the two plans that govern the Park: the FMP and GMP.  The FMP governs the fish resources in the Park, AR_10, while the GMP focuses on the Park as a whole, AR_347.  As NPS formulated both plans, it identified that the Park's coral reefs and fish species were in poor condition, and set forth new policies to address that problem.  AR_386–387.

Specifically, in the Record of Decision for the GMP, NPS said that it would pursue the Marine Reserve Zone "as soon as practicable."  AR_1323.  Inaction would threaten the Park's coral reefs, whereas creating the Marine Reserve Zone would safeguard them.  AR_618; AR_1317–21.  By preserving habitats and setting aside a portion of the Park as a refuge from

fishing, the Marine Reserve Zone would also protect the fish population within the Park. AR_772.  Similarly, in the Record of Decision for the FMP, NPS endorsed a regime of fishing permits that would expire over time and gradually eliminate commercial fishing in the Park. AR_312–16; AR_50–51.  NPS believed the phase-out effort would help address the "degradation of park fishery resources."  AR_54.  In combination, the Marine Reserve Zone and commercial fishing phase-out would govern fishing in the Park in several respects—who, what, when, where, and how.

As of 2024, neither the Marine Reserve Zone nor the commercial fishing phase-out regulation has been implemented, and NPCA argues that NPS has abandoned its efforts to pursue these policies.  To be sure, both policies were met with resistance from local politicians. AR_1405.  The FWC, NPS's partner in regulating the Park, also opposed both policies. AR_1904.  And moreover, the hold-up is not that NPS requires more time to figure out its own proposals: the GMP spelled out the exact location of the Marine Reserve Zone and what activities would be restricted, while the draft-rule to phase-out commercial fishing and the corresponding economic analysis have been completed since 2016.  AR_491 (depicting map of Marine Reserve Zone); AR_1990.  Accordingly, one naturally wonders whether NPS backed down after facing opposition.

That leads to the 2020 MOU between NPS and FWC, which is the purported final agency action that NPCA asks the Court to review.  This MOU was not the first of its kind; a preceding and expired memorandum of understanding from 2012 shared similar language.  *See* AR_241–251.  Like that previous document, the 2020 MOU addresses how NPS and FWC will cooperate to implement the goals of the FMP.  Notably, the 2020 MOU envisions that FWC will take a leading role in regulating the Park's fishery resources.  Accordingly, while NPCA emphasizes

the recitals of the MOU, the substantive provisions of the MOU spell out an agreement on scientific monitoring of conditions within the Park to determine whether FWC's approach is consistent with the goals in the FMP.

Nonetheless, according to NPCA, the true meaning of the 2020 Memorandum of Understanding is that it reflects the abandonment of NPS's prior goals. In the recitals of the MOU, NPS "recognize[d] the FWC's position that marine reserves (no-take areas) are overly restrictive and acknowledge[d] that the FWC does not intend to implement a marine reserve (no-take area) in Park waters as part of the Fishery Management Plan." AR_1850–51. NPS and FWC also "agree[d] to seek the least restrictive management actions necessary to fully achieve the Fishery Management Plan's mutual management goals for the fishery resources of the Park and adjoining areas." AR_1850. In NPCA's reading, these terms foreclose the possibility that NPS will pursue the Marine Reserve Zone and the commercial fishing phase-out.

NPCA's interpretation is contradicted by other parts of the MOU. The MOU expressly provides room for NPS to diverge from FWC's positions. It states that "the missions of the FWC and the Park may differ" and that "there may be occasion when the two agencies choose to disagree." AR_1855. It also provides that "the agencies agree to consult with each other on any additional actions they may propose to conserve or protect fish populations and other aquatic resources within Park boundaries or to further regulate the fisheries." AR_1854. By its own terms, the MOU does not prohibit NPS from pursuing additional regulations that FWC may oppose, such as the Marine Reserve Zone and the commercial fishing phase-out.

The parties also dispute how the MOU intersects with the FMP and GMP. Defendants correctly note that because the MOU primarily concerns fishing management and the FMP, it does not directly govern the Marine Reserve Zone, which is a GMP policy. Defs.' Mot. at 14.

Conversely, the MOU does suggest that NPS has conceded that the Marine Reserve Zone is a disfavored approach when it says that "FWC and the Park agree that, 'when possible and practicable, stocks of fish shall be managed as a biological unit'" because "measures to end overfishing and rebuild stocks are most effective when implemented over the range of the biological stock." AR_1850. A Marine Reserve Zone—which would cover just about 6% of the Park's waters—is implemented over only a small subset of the range of the biological stock. Still, the MOU again allows for disagreement by advising that this language "is not intended to preclude implementation of additional or more restrictive management measures within the Park than in adjacent State waters as a means of achieving mutual objectives." *Id.*

NPCA attacks Defendants' argument that the MOU is distinct from the GMP and Marine Reserve Zone by citing the 2012 Memorandum of Understanding between NPS and FWC. [5] Pl.'s Mot. at 29. That document noted NPS's intent "to consider the establishment of one or more marine reserves (no-take areas) under its General Management Planning process for purposes other than sound fisheries management." AR_242. NPCA says that the absence of any comparable language in the 2020 MOU indicates that NPS has now given up on the Marine Reserve Zone. *Id.*

Defendants respond that it "makes no sense," Defs.' Mot. at 14, to say that the omission of a similar provision in the MOU indicates the Park has given up on the Marine Reserve Zone. In Defendants' view, because NPS and FWC signed the 2012 Memorandum before the 2015 GMP was finished, "[w]hen the 2020 MOU was signed, there was simply no need for the Park to continue to declare that it would consider a reserve in its now completed GMP planning

---

[5] NPCA references an "earlier 2014 version" of the MOU, but it is apparent from context that it intends to refer to the 2012 MOU. *See* Pl.'s Mot. at 29.

process." *Id.* That is factually accurate, but the now-completed GMP process ended with NPS "determin[ing] that implementing a marine reserve zone is the proper course of action." AR_1895. Taking Defendants' interpretation as true, it is odd that NPS found it important to raise a marine reserve as an issue when it was only under consideration, and then later to omit any mention after deciding the Marine Reserve Zone was in fact the right idea and should be instituted as soon as practicable. After all, the MOU had room to convey *FWC's* position on marine reserves.

NPCA raises other plausible indications from outside the MOU that by 2020, NPS had abandoned the Marine Reserve Zone and commercial fishing phase-out. In particular, the 2018 memorandum from then-Secretary Zinke lends additional credence to NPCA's view of events. As the Court interprets NPCA's position, it does not say that the Zinke memorandum itself was a final agency action, but that it should be viewed "together" with the MOU. Pl.'s Mot. at 29; *but see* Defs.' Mot. at 13 (interpreting NPCA to argue that Zinke memorandum is an expression of final agency action). The Zinke memorandum conveyed the Department of the Interior's "commitment to defer to the States" for fish and wildlife management. AR_1903. The memorandum also began an internal policy review intended to determine where federal regulations were stricter than state law, and to harmonize management with the states if necessary. *Id.* Florida, in response, was "excited about the prospect of avoiding the implementation of a MRZ." AR_1904. Moreover, the 2020 MOU can plausibly be viewed as consistent with the Zinke memorandum's commitment to empower states, given how it entrusts FWC with responsibility to meet the FMP's goals.

Although Florida identified the Zinke memorandum as an opportunity to prevent the Marine Reserve Zone, the Court believes that NPCA makes a more persuasive case when it

argues that the 2020 MOU abandoned the commercial fishing phase-out, rather than when NPCA says the same for the Marine Reserve Zone.  Because the MOU largely delegates implementation of the FMP's goals to the FWC, which does not support a commercial fishing phase-out, it appears unlikely that any phase-out is forthcoming.  A comparable inference does not necessarily follow for the Marine Reserve Zone.  But even the commercial fishing phase-out has not been completely taken off the table under the MOU.  After FWC issues regulations to achieve the FMP goals and the agencies jointly monitor their efficacy, FWC and NPS may work together to "determine if additional management measures should be considered in order to accomplish these FMP Goals."  AR_1856.  And as will be discussed in greater detail when reviewing NPCA's Section 706(1) claim, *see infra* at 42, this language parallels the FMP's view of the commercial fishing phase-out, which describes the phase-out as a measure to achieve FMP goals.  Accordingly, it is consistent with the FMP for NPS to withhold implementation of the commercial fishing phase-out until other solutions are tried first.

Ultimately, while the MOU was enacted at a time when the prevailing winds favored deference to FWC's positions, the Court cannot locate firm evidence that the 2020 MOU represented "for all intents and purposes, the consummation of [NPS's] decisionmaking process" on the Marine Reserve Zone and the commercial fishing phase-out.  *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 58 (D.D.C. 2019).  NPCA has not identified specific language showing an NPS decision against the implementation of a Marine Reserve Zone or fishing phase-out.  Conversely, Defendants identify numerous provisions that acknowledge the potential for disagreement between NPS and FWC and the potential for additional measures—which could include the Marine Reserve Zone and commercial fishing phase-out.

The MOU's flexible terms do not mean that NPCA is without a basis to suspect that NPS has abandoned the Marine Reserve Zone and commercial fishing phase-out.  NPS's substantial delay in moving forward speaks for itself.  And after NPS has emphasized cooperation with FWC and given FWC a driving role over fishery management in the Park, it is difficult to imagine that NPS intends to pick a fight over policies that FWC opposes.  But NPCA does not identify a document or specific evidence in the record that supports the idea that NPS's failure to act on the Marine Reserve Zone and commercial fishing phase-out is final.  *Cf. Safari Club Int'l v. Jewell,* 842 F.3d 1280, 1289 (D.C. Cir. 2016) (recognizing that where "the writing was . . . on the wall" about how an agency would act, an agency's findings could be treated as final).  Section 706(2)(A) provides no avenue for this Court to step in based on suppositions about what NPS will probably do, or in this case, not do.  Unless there is a final agency action, NPS has no cause of action here.  *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that [the party] would lack a cause of action under the APA.").  Thus, the Court will grant judgment for Defendants on NPCA's Section 706(2)(A) claims.

Because NPCA has not identified a final agency action, the Court proceeds no further in assessing its arguments under Section 706(2)(A).  Specifically, while NPCA alleges that it was arbitrary and capricious for NPS to change its policy without adequate explanation, the record does not support NPCA's contention that NPS changed its policy.  The same is true for NPCA's argument that NPS's alleged policy shift violates the NPS Organic Act and that federal regulations ban commercial fishing in the Park.  These arguments rely on many of the same facts as NPCA's Section 706(1) claims, which the Court considers next.

**B.  NPS Must Promulgate a Marine Reserve Zone Regulation**

In its Section 706(1) claim, NPCA argues that NPS has neglected its duty to act and impermissibly delayed the promulgation of regulations instituting the Marine Reserve Zone and commercial fishing phase-out.  Defendants counter that the Marine Reserve Zone and commercial fishing phase-out are not discrete or mandatory actions that can be compelled, and that even if they were, NPS has taken a reasonable amount of time to implement them.  The Court agrees with NPCA that NPS has unreasonably delayed action on the Marine Reserve Zone, but concludes that NPS has no duty concerning the commercial fishing phase-out.

1.  Source of the Duty to Act

At the outset of its Section 706(1) analysis, the Court must determine whether NPS is "required to take" the actions that NPCA seeks to compel.  *SUWA*, 542 U.S. at 64 (emphasis omitted).  NPCA argues that such a requirement exists in the Organic Act and NPS's RODs for the GMP and FMP, *see* Pl.'s Mot. at 18, 33–34, while Defendants assert that none of these sources give rise to a clear duty to act, *see* Defs.' Mot. at 27–28.  NPCA has the better argument, at least as it pertains to the Marine Reserve Zone.

*a.  The Organic Act's Conservation and No-Impairment Mandates*

The NPS Organic Act, 54 U.S.C. § 100101, *et seq.* provides that NPS "shall promote and regulate the use of the National Park System."  *Id.* § 100101(a).  NPS is given this authority for the "purpose" of "conserve[ing] the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  *Id.*  The D.C. Circuit has recognized that "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on

how to implement his statutory mandate." *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).  Nonetheless, "that discretion is bounded by the terms of the Organic Act itself." *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 193 (D.D.C. 2008).  The "Organic Act clearly states . . . that the fundamental purpose of the national park system is to conserve park resources and values." *Id.* at 192.  Likewise, NPS's official interpretation of the Organic Act provides that "conservation is to be predominant." *Id.* (quoting NAT'L PARKS SERV., MANAGEMENT POLICIES 2006 § 1.4.3 ("NPS Policies"), www.nps.gov/subjects/policy/upload/ MP_2006.pdf.  Put another way, "the overriding aim of the Organic Act, as well as the purpose of NPS'[s] oversight and management of the park system, is to conserve the natural wonders of our nation's parks for future generations." *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 21 (D.D.C. 2010); *see also Nat'l Rifle Ass'n of Am. v. Potter,* 628 F. Supp. 903, 909 (D.D.C. 1986) ("In the Organic Act[,] Congress speaks of but a single purpose, namely, conservation.").

NPS's Management Policies interpret the Organic Act: they emphasize that NPS must follow two mandates.  *See generally* NPS Policies.  First, the "fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values." *Id.* § 1.4.3. This conservation "mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired." *Id.*  Pursuant to the conservation mandate, NPS "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values." *Id.*

Second, the no-impairment mandate requires NPS to prohibit activities that impair park "resources and values." *Id.* § 1.4.4.  If NPS determines that because of ongoing activity in a

park, "there is, or will be, an impairment, [NPS] must take appropriate action" to stop that impairment-causing activity and "eliminate the impairment as soon as reasonably possible." *Id.* § 1.4.7. "The NPS Policies guide the agency in determining what constitutes an impairment." *Bluewater Network*, 721 F. Supp. 2d at 21. An impairment is

> [A]n impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Whether an impact meets this definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts.

NPS Policies, § 1.4.5. An impact to park resources is "more likely to constitute impairment" when it affects a resource or value whose conservation is "necessary to fulfill specific purposes identified in the establishing legislation . . . of the park; key to the natural or cultural integrity of the park . . . or identified in the park's general management plan or other relevant [Park Service] documents as being of significance." *Id.*

NPCA contends that the Park is currently facing impairments that NPS has a duty to address, while Defendants respond that NPCA mischaracterizes the record. In NPCA's view, NPS's documentation of the significant environmental degradation in the Park is sufficient to show impairment. Defendants say that impairment is a specific decision left to an NPS manager, and that there has been no finding of impairment here. The Court agrees with NPCA that NPS has identified grave conditions in the Park, but agrees with Defendants that the Park is not formally "impaired" under the Organic Act. Nevertheless, as explained below, NPS's discretion remains limited by the Organic Act's conservation mandate and NPS's own prior commitments.

The Park is in bad shape. NPS emphasized in the 2015 GMP ROD that without protective measures, the Park faced "moderate or major adverse impacts to fishery resources, federally listed sea turtles, smalltooth sawfish, and stony corals, [and] submerged aquatic

communities."  AR_637; AR_275 (explaining that without intervention "the condition of the

park's fisheries resources would be expected to continue to decline.").  Based on other NPS

documents in the record, these impacts are largely attributable to human activity, because

"[d]espite the [P]ark and agency's missions, the coral reef ecosystems have been in decline in

Biscayne National Park, due in large part to . . . fishing pressure and vessel groundings as well as

a number of factors outside the control of marine park managers such as climate change [ ] and

disease."  AR_965.  NPS has described the Park as "[e]ndangered," AR_372, and explained that

by 2015, "[o]nly 6 percent of the park's once-thriving corals" were still alive, AR_1181.

Moreover, NPS's superintendent of Biscayne National Park explained the need to preserve this

"nearly imperiled resource."  AR_1256.  "Peer-reviewed studies have consistently detailed the

loss of biological integrity of the park's coral reef" and that "the reef's coral and fish resources

are greatly diminished from previous years."  AR_1170.  NPS observed in the 2014 FMP that

"there is agreement that the fishery resources within the park are extremely stressed and need

special attention."  AR_14.  NPCA argues that "[h]aving developed a factual record of ongoing

impairment," NPS cannot now claim the opposite and disclaim a duty to resolve that impairment.

Pl.'s Reply at 4.

　　　　Yet the fact that the Park's inhabitant species are facing stressors and population decline

does not necessarily mean that these Park resources are impaired within the meaning of the

Organic Act.  Defendants note that not every negative impact is an impairment.  *See* Defs.'

Reply at 3 (citing NPS Policies § 1.4.3).  Impairment is a legally defined term that depends on

the factual determination of the responsible NPS manager.  *Id.* at 2 (citing NPS Policies § 1.4.5).

That "NPS decision-maker must use his or her professional judgment" in discerning impairment.

NPS Policies § 1.4.7.

Defendants further explain that NPS never declared that the Park's resources were impaired at the time it issued the FMP and the GMP RODs.  In the FMP EIS, NPS noted that taking no action "could potentially *lead to* impairment" of the targeted fish populations in the future, AR_80 (emphasis added), meaning that no impairment existed at the time, while for coral reefs inaction "would be unlikely to result in impairment of the resource over time." AR_125. In the GMP ROD, NPS did not directly address impairment but found that "[u]nder the no-action alternative, impacts on park fishery resources and fish habitat caused by boating and fishing in the park would continue to be adverse, minor to moderate, and long term." AR_618.  Regarding coral reefs, "[m]anagement activities under this [no-action] alternative would continue to have long-term, moderate, adverse impacts on these species." AR_620.  But NPS did not identify these impacts as leading to impairment, which again, is a legally consequential determination.[6]

NPS has "broad, but not unlimited discretion" to effectuate its non-impairment mandate, *Daingerfield Island Protective Soc'y. v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994) (internal quotation marks and citation omitted), and in assessing impairments, an "agency's decisions are entitled to a presumption of regularity," *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 84 (D.D.C. 2013) (internal quotation marks and citation omitted).  "[O]nce assured the agency has engaged in reasoned decisionmaking, it is not for the Court to reweigh the conflicting evidence or otherwise substitute its judgment for that of the agency." *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 75 (D.D.C. 2014) (cleaned up).  The Court sees no reason to disregard NPS's assessment on impairment from 2014 and 2015.  That still leaves open the possibility that NPS's

---

[6] Defendants also note that as part of the FMP and GMP RODs, NPS produced a non-impairment determination that the selected alternatives in the Plans would not cause impairment. *See* Defs.' Mot. at 19; AR_330–339; AR_1341–1346.  But NPCA has never alleged that the selected alternatives would cause impairment: the issue in this action is that central portions of those selected alternatives have not been implemented.

ongoing inaction in the interceding years will lead to impairment, but here too, the Court

declines to make a determination ordinarily reserved for an NPS manager.  To the extent NPCA

now alleges that the RODs impermissibly failed to identify impairments or that NPS is derelict in

its current duty to identify impairments, it did not spell out those claims at the appropriate

junctures, and it is now too late.  *See Hargrove v. AARP*, 205 F. Supp. 3d 96, 114 (D.D.C. 2016)

("It is well established, however, that a party may not amend its complaint or broaden its claims

through summary judgment briefing.") (cleaned up).

     Still, that is not the end for NPCA.  The conservation mandate in the Organic Act, and in

NPS's management policies, also obligates NPS to minimize and avoid adverse impacts in the

Park.  *See* 54 U.S.C. § 100101; NPS Policies § 1.4.3.  NPS has considerable discretion to

implement the mandate, so without more, that statutory command would be unlikely to create

any specific commitments to act.  *See* NPS Policies § 1.4.3.  But here, there is more.

### b.  NPS's FMP and GMP RODs Can Bind It

     NPS may not have identified impairment, but it certainly found that non-action would

cause continued serious environmental harms.  AR_11–12; AR_348; AR_350; AR_617.  Not

only that, the RODs identified measures that NPS believed would improve conditions for the

Park's coral reefs, fish species, and other resources.  AR_312; AR_1318.  NPS made these well-

explained decisions for a reason.

     The D.C. Circuit has suggested that "statements" contained in RODs can "create[] a

binding duty" on agencies.  *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1245 (D.C. Cir.

2018).  Indeed, a federal regulation provides that "conditions established in the [EIS] or during

its review and committed as part of the decision shall be implemented . . .."  *Id.* (quoting 40

C.F.R. § 1505.3).  The D.C. Circuit also noted that the Ninth Circuit has cited 40 C.F.R. § 1505.3

"for the proposition that, where an agency commits to a measure in its EIS, the agency is required to implement the measure." *Id.* (citing *Tyler v. Cisneros*, 136 F.3d 603, 608 (9th Cir. 1998)).

Like this action, *W. Org. of Res. Councils* concerned an alleged failure to act under § 706(1). *Id.* at 1241 ("Appellants' cause of action in this case rests solely on § 706(1) of the APA, which states that a 'reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.'" (quoting 5 U.S.C. § 706(1))). Ultimately, because the agency in question had passed a later final rule that removed the statements contained in its ROD, the D.C. Circuit found the "Department's own documents [did not] create a legal duty." *Id.* at 1245. Nevertheless, the panel's opinion suggests that under different circumstances—such as where an agency has not otherwise amended or superseded its ROD—an agency's statement in an ROD may be sufficient to create a legal duty. *Id.* ("These . . . statements [in a ROD] might have created a binding duty on the agency at one point.").

Other courts have applied the Ninth Circuit's view that 40 C.F.R. § 1505.3 "binds an agency to commitments made during the NEPA process." *All. for Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1038 (D. Mont. 2023) (citing *Tyler*, 136 F.3d at 606). In *Alliance for Wild Rockies,* the court held that "the non-discretionary commitments the [Fish and Wildlife] Service lays out for itself in the ROD are binding and establish a duty to act that may be compelled under § 706(1) of the APA." *Id.* Another case similarly agreed that "[t]he Code of Federal Regulations requires the [agency] to follow through with the commitments it makes in a record of decision." *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123 (D. Mont. 2016) (citing 40 C.F.R. § 1505.3). These cases have also additionally noted that a "Council on Environmental Quality directive explains that 'agencies will be held accountable for preparing Records of

Decision that conform to the decisions actually made and for carrying out the actions set forth in the Records of Decision.'" *See All. for Wild Rockies*, 661 F. Supp. 3d at 1037 (citing 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981)); *Friends of Animals*, 200 F. Supp. 3d at 1123–24 (same).

Although Defendants argue otherwise, *see* Defs.' Mot at 26–28, treating the commitments an agency has made in a ROD as non-discretionary is consistent with *SUWA*, 542 U.S. 55.  In *SUWA*, the Supreme Court held that a Bureau of Land Management land use plan was not enforceable under Section 706(1).  542 U.S. at 72.  The Court's decision there, however, relied on the non-mandatory nature of land use plans.  The Court noted that "land use plans are a preliminary step in the overall process of managing public lands . . . [and are] not ordinarily the medium for affirmative decisions that implement the agency's projections." *Id.* at 69 (alterations adopted).  The Court further explained that because these land use plans tend to guide and limit an agency's approach rather than expressly commanding action, agencies are not typically legally bound to the projections of agency action contained in them. *Id.* at 71.  Generally, agencies "issue management decisions to implement land use plans—the decisions, that is, are distinct from the plan itself." *Id.* at 69 (cleaned up).  By contrast, RODs are more concrete and are the *records of decision* that lay out an agency's future approach, which may also be cabined by other statutory guidance such as the Organic Act's conservation mandate.  Under *SUWA*, an agency action specifically called for in a plan can "be compelled when . . . language in the plan itself creates a commitment binding on the agency." *Id.* at 71.  Thus, other courts have determined that *SUWA* does not preclude Section 706(1) claims where the duty to act stems from an ROD with adequately binding language. *See Friends of Animals*, 200 F. Supp 3d. at 1125 (distinguishing plan challenged in *SUWA* from claim based on binding commitment in ROD); *see also W. Org. of Res. Councils,* 892 F.3d at 1241, 1245 (contemplating Section 706(1) claim

based on ROD after extensively discussing *SUWA* elsewhere in opinion).  This Court agrees with those conclusions.

Consequently, in this action, a duty binding on NPS could stem from NPS's conservation mandate, the two RODs, or a combination thereof.  The Court next turns to the FMP and GMP RODs to determine whether these documents create binding commitments to act.

2.  NPS's Commitment to Create a Marine Reserve Zone is a Discrete Agency Action that NPS is Bound to Take, While the Commercial Fishing Phase-Out is Not

*a.  The GMP ROD Binds NPS to Create the Marine Reserve Zone*

After NPS has detailed significant risks to the Park and announced that it would promulgate a regulation implementing a Marine Reserve Zone, it cannot now disclaim its responsibility to follow through with that commitment.  Section 706(1) "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act."  *SUWA*, 542 U.S. at 64 (internal quotation marks and citation omitted).  The APA does not authorize "broad programmatic attack[s]," *id.*, or orders seeking "compliance with broad statutory mandates," *id.* at 66.  Accordingly, NPCA may not seek "wholesale change to an entire federal program" or ask the court to "inject itself into the day-to-day agency management . . . ." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018) (ordering ICE to consider plaintiffs' placement under a federal statute).  Nor may plaintiffs seek an order compelling an agency to change its "general mode of operations." *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 27 (D.D.C. 2017).

Here, NPCA merely asks the Court to order NPS to take a specific action that it already said that it would take.  As recounted previously in this opinion, after years of review and public comment, NPS selected a GMP alternative where the Marine Reserve Zone is a "[a] key

component."[7]  AR_349.  The GMP ROD explores the environmental degradation within the Park as well as the reasons why the Marine Reserve Zone "*will* provide a high level of protection to the reef." AR_1321 (emphasis added).  NPS already determined the exact boundaries of where the Marine Reserve Zone "will be," AR_1322, as well as what activities will be allowed and prohibited in the Zone, AR_1321.  The ROD provided that NPS would publish a "proposed special regulation to designate the marine reserve zone" "[a]s soon as practicable."  AR_1323.

Because this commitment came in a Record of Decision that was the culmination of a years-long process replete with public participation and scientific assessment—and because "conditions established in [an EIS] . . . shall be implemented," *see* 40 C.F.R. § 1505.3—the commitment is more than just "statement[s] in a plan that [the agency] 'will' take this, that, or the other action."  *SUWA*, 542 U.S. at 69.  Instead, this case is akin to other examples where courts have held that agencies are "bound to the commitments" they make in an ROD.  *See Friends of Animals*, 200 F. Supp. 3d at 1123.  In *Friends of Animals*, the Bureau of Land Management stated in a record of decision that it would recalculate the appropriate management levels of wild horses in a particular region "within five years or after the revision to the Billings [Resource Management Plan], whichever comes first."  *Id.* at 1120.  The court held that this language constituted a commitment, binding under § 1505.3, that could be compelled through Section 706(1).  *Id.* at 1123.  Similarly, in *Alliance for Wild Rockies* the U.S. Fish and Wildlife Service's ROD specifically described the steps that it would take to promote the recovery of the grizzly bear population, including the "establishment of a Citizen Management Committee, the

---

[7] To be precise, the GMP describes the Marine Reserve Zone as a key component of an agency-preferred alternative that was not ultimately adopted, Alternative 4, however, the ultimately chosen Alternative 8 "combines" the Marine Reserve Zone from Alternative 4 with other management zones taken from Alternative 6.  AR_347–49; AR_353.

exercise of education efforts, and the bear-preparation tasks."  661 F. Supp. 3d at 1037–38.  The court thus found that "the non-discretionary commitments the Service lays out for itself in the ROD are binding and establish a duty to act that may be compelled under § 706(1) of the APA." *Id.* at 1038.

Here, the ROD is similarly clear that NPS would promulgate a proposed special regulation creating the Marine Reserve Zone.  The only possible language that would preserve discretion for NPS not to act is a single sentence addressing that NPS will publish the proposed special regulation "[a]s soon as practicable after the publication of the Notice of Availability and Summary of the Record of Decision in the Federal Register."  AR_1323.  That language does not provide NPS with a way out of its obligation to promulgate the regulation.  Nothing in that sentence indicates that NPS may delay the Marine Reserve Zone subject to funding concerns or other logistical hurdles—in fact, it states that NPS will move quickly.  This language appears to exist to clarify that NPS will not publish the proposed special regulation until after the GMP ROD has been released in the Federal Register.  Presumably this is so because it would confuse the public if NPS published the proposed Marine Reserve Zone regulation *before* the public availability of the GMP ROD describing NPS's decision on the Marine Reserve Zone.  Overall, if the GMP ROD's language did "not constitute a commitment, then no language will suffice." *All. for Wild Rockies*, 661 F. Supp. 3d at 1037 (quoting *Friends of Animals*, 200 F. Supp. 3d at 1125); *see SUWA*, 542 U.S. at 71 (explaining that action can be compelled when "language in the plan itself creates a commitment binding" on the agency).

In addition to being non-discretionary, the promulgation of the Marine Reserve Zone special regulation is also a discrete action.  Defendants are incorrect that what NPCA "seeks to compel is systemic 'improvement' of the [GMP] in pursuit of vaguely defined compliance with

the Organic Act's broad mandates."  Defs.' Mot. at 26.  It is true that the GMP includes many

different policies intended to advance the Organic Act's conservation mandate, but NPCA

targets only specific parts of that plan.  In other words, NPCA does not ask the Court to

command NPS to simply do a better job, or to "meddl[e]" with NPS's "tentative" efforts to

implement all aspects of the GMP.  *Center for Biological Diversity*, 260 F. Supp. 3d at 29.

NPCA only wishes for NPS to follow through on its prior commitment to promulgate a

regulation establishing a Marine Reserve Zone as soon as practicable.  *See* Compl. ¶¶ 71–79.

Promulgating a proposed special regulation that creates a Marine Reserve Zone is a single action

that is sufficiently "discrete."  *See SUWA*, 542 U.S. at 64.  Accordingly, NPCA can properly ask

this Court to review whether NPS has impermissibly delayed that action pursuant to

Section 706(1).

### b.  NPS is Not Bound to a Commercial Fishing Phase-Out

Conversely, NPS has not made a firm commitment to the commercial fishing phase-out,

so NPS is not "required to take" any specific action in this regard.  *SUWA*, 542 U.S. at 62–64.

There are key differences between the GMP's unequivocal language on the Marine Reserve

Zone and the FMP's more-aspirational discussion of the commercial fishing phase-out.  Without

a doubt, the FMP envisions that NPS would pursue a commercial fishing phase-out.  AR_312–

15.  And after the FMP, NPS went so far as to develop a final draft rule for the commercial

fishing phase-out but failed to receive clearance from Washington, D.C. to promulgate it.

AR_1766 ("The Park submitted the draft rule to the NPS Washington, DC office.").

But while NPS may have desired to move forward on the commercial fishing phase-out

until other forces delayed those plans, the FMP is emphatic that it does not bind NPS to that goal.

The FMP expressly "focuses on Desired Future Conditions (DFCs) of the park's fisheries

resources and *not* on the exact management activities to be implemented." AR_312 (emphasis in original). Those Desired Future Conditions are not themselves an end to commercial fishing, but an "increase in the abundance and average size of targeted fish and invertebrate species within the park by at least 20% over current conditions and over conditions in similar habitat outside the park." *Id.* So although the FMP envisions that gradually restricting commercial fishing permits will be part of the plan to achieve NPS's goals, it is the role of "the cooperating agencies … [to] work together to develop the specific regulatory changes necessary to achieve the DFCs of the selected Alternative." *Id.* NPS has chosen to work closely with FWC, *see supra* at 10–12, to try to achieve the Desired Future Conditions through measures that do not include the commercial fishing phase-out, at least not immediately.

It is also true that, under the FMP, NPS planned for a "range of tools," AR_40, to achieve the Desired Future Conditions that include 1) the promulgation of a special regulation permitting only limited commercial fishing, AR_50, 2) the "establishment of a non-transferable permit system," *id.*, so that the number of commercial fishers will slowly decline, and 3) a restriction that "[n]ew commercial fisheries would [not] be allowed to develop within the park," AR_118. But the language in the plan contemplates the possibility that NPS may not implement these exact policies. They are management options which "may occur." AR_312. A commercial fishing phase-out "could be used to achieve the DFC's . . . [but] the specific details of the regulatory changes required . . . would be determined" in conjunction with FWC. AR_40. These equivocations, even in light of the Organic Act's conservation mandate and NPS's findings about the Park, refute NPCA's argument that NPS made a binding commitment to the commercial fishing phase-out.

Thus, rather than further contemplate "a judicial decree compelling immediate preparation of all of the detailed plans called for in the [FMP]," the Court recognizes that to step in and demand "general enforcement of plan terms would [be] pervasive interference with [NPS's] own ordering of priorities." *SUWA*, 542 U.S. at 71–72. Because NPS has no duty to implement the commercial fishing phase-out, the Court "find[s] it unnecessary to consider whether the action envisioned by the [FMP] is sufficiently discrete to be amenable to compulsion under the APA", *id.* at 72, nor will it proceed to the *TRAC* factors on this aspect of NPS's claim.

Lastly, before moving on, the Court notes that NPCA observes that long-standing federal regulations prohibit commercial fishing in the park, notwithstanding actual practices. 36 C.F.R. § 2.3(d)(4). NPS has acknowledged this inconsistency. AR_1107 ("Although commercial fishing occurs in Biscayne National Park, it has been prohibited for more than 30 years." (citation omitted)). In fact, NPS noted in the FMP EIS that its Management Policies "require NPS to promulgate a special regulation . . . to allow commercial fishing to continue in [the Park]." AR_40. NPCA's argument on this point, however, is underdeveloped as to how this legal backdrop should inform the Court's opinion and order here. Furthermore, while NPS intended to issue a regulation regularizing commercial fishing within the Park in tandem with a new permitting regime, the Court has already decided that NPS has not obligated itself to implement that phase-out approach. The Court does not understand NPCA to be requesting that NPS promulgate a special regulation to *allow* commercial fishing.[8] Because the parties have not addressed this possibility, the Court will decline to explore it further, and moves on to deciding whether it should compel NPS to act on the Marine Reserve Zone.

---

[8] NPCA has also suggested that rather than promulgating a new regulation, "[NPS] could simply begin complying with, and enforcing, the existing ban on commercial fishing, 36 C.F.R. § 2.3(d)(4)." Pl.'s Mot. at 35 n.8. It is unclear what NPCA is requesting through this statement.

3.  NPS Has Impermissibly Delayed Action on the Marine Reserve Zone

As discussed above, the Court has found that NPS's decision in the 2015 GMP to establish a Marine Reserve Zone "create[d] a commitment binding on the agency," *SUWA*, 542 U.S. at 71, and that promulgating a Marine Reserve Zone draft regulation is a discrete act.  When these requirements are met, the D.C. Circuit has set out a six-factor balancing test to determine whether an agency has unreasonably delayed action in a manner warranting relief.  *TRAC*, 750 F.2d at 80.  Under *TRAC*, the Court looks to the following factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order that agency action is "unreasonably delayed."

*Id.* (cleaned up) (citations omitted).  In applying the *TRAC* factors, courts have explained that "[n]o one factor is determinative" and "[e]ach case must be analyzed according to its own unique circumstances."  *In re Pub. Emps. for Envtl. Resp.*, 957 F.3d 267, 273 (D.C. Cir. 2020) (second alteration in original) (quoting *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984)).

Here, the factors lead the Court to conclude that NPS has unreasonably delayed the promulgation of the Marine Reserve Zone regulation. To better structure that analysis, the Court will assess the factors in turn.

### a. The First and Second TRAC Factors[9]

The first *TRAC* factor weighs in favor of relief here because NPS has not adequately provided a "rule of reason" to justify its delay on the Marine Reserve Zone. *TRAC*, 750 F.2d at 80. To begin, none of the relevant statutes—the Organic Act, NEPA, or Enabling Act—specify any deadlines or timetable for when NPS must act, meaning that the second *TRAC* factor plays little role here. Defendants contend that this omission means that the only applicable timeline comes from the NPS Policies and the GMP itself. Defs.' Reply at 17. NPS policies provide that GMPs "take the long view, which may project many years into the future, when dealing with the time frames of natural and cultural processes." NPS Policies § 2.3.1. Similarly, Defendants emphasize that the GMP was intended to "provide updated management direction for the entire park for the next 15 to 20 years." AR_347. Accordingly, Defendants argue, the current delay of nearly 9 years falls within that longer time horizon. That argument misses the point.

NPS committed to promulgating the draft Marine Reserve Zone regulation "*as soon as practicable.*" AR_1323 (emphasis added). Defendants' reading would flip this imperative language on its head, arguing that it provides NPS discretion to take as long as it wants to issue the regulation. But there is no indication in the GMP ROD of what factors—such as budget, logistical complexity, or an assessment of environmental conditions—could prevent this step from being practicable. *See id.* Rather, as discussed *supra* at 40, the only constraint on the

---

[9] The "first two factors are often considered together." *Ahmadi v. Scharpf*, No. 23-cv-953 (DLF), 2024 WL 551542, at *5 (D.D.C. Feb. 12, 2024).

promulgation of the draft rule is that it should wait until after the ROD is made available for public comment.  That sensible order of operations does not justify a 9-year wait.

Moreover, the GMP may govern for 15 to 20 years, but NPCA is asking NPS to complete one specific action, not implement an entire plan all at once.  Indeed, as the GMP EIS reflects, NPS considered alternatives 6 and 7, which would have delayed the implementation of a reserve zone until after a 10-year interval of scientific monitoring to determine if intermediate measures had been successful.  AR_469; AR_477.  NPS rejected such a 10-year wait when it chose alternative 8 as its preferred alternative, and yet it has now delayed action for nearly 9 years.  AR_485–88; AR_1323.  Given the context of NPS's ROD, the Court cannot interpret the "as soon as practicable" language in the GMP ROD to be consistent with a period of time as long as NPS's delay here.

"Of course, a reasonable time for action depends on 'the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" *In re Pub. Emps. for Env't Resp.*, 957 F.3d at 274 (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)).  But, echoing the GMP ROD's silence on any specific predicates to action on the Marine Reserve Zone regulation, Defendants have not introduced any compelling factual evidence for why it has not been "practicable" to move forward.  After all, NPS extensively studied the Marine Reserve Zone before finalizing the GMP ROD, and set exact boundaries, making it implausible that the agency would require additional years to figure out the details of a possible regulation.  While the Court is sure that NPS must balance trade-offs and priorities, like any agency, Defendants make only cursory statements to describe how a shortage of resources or prioritization of other GMP policies has caused NPS to put the Marine Reserve Zone on the backburner.  *See* Defs.' Reply at 21.  Defendants cite an

NPS statement that "[f]ully implementing the GMP is also dependent on funding and staffing that we have not been able to secure," AR_1769, but that document does not say it is the implementation of the Marine Reserve Zone *specifically* that is dependent on funding and staffing. Instead, it observes that implementing the Marine Reserve Zone has faced other "obstacles since 2015." *Id.* Defendants also note that as of 2023, NPS has begun installing mooring buoys in the area designated for the Marine Reserve Zone, which is a prerequisite to a prohibition on anchoring. AR_2047–58; AR_448. It is hard to see why that physical step within the Park would be necessary before —or would take resources from—NPS's effort to promulgate a regulation on the Marine Reserve Zone.

Thus, the Court is unconvinced that NPS has presented a rule of reason to explain its delay here. "[E]ven the lack of a hard deadline 'does not give government officials carte blanche to ignore their legal obligations.'"[10] *In re Pub. Emps. for Envtl. Resp.*, 957 F.3d at 274 (quoting *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001)). And as indicated when discussing NPCA's Section 706(2)(A) claim, *see supra* at 24, the record supports the proposition that NPS is deferring action on the Marine Reserve Zone to avoid conflict with FWC and other opponents of the idea. *See, e.g.*, AR_1567 (noting that "[s]everal less controversial elements of the

---

[10] NPCA introduces several cases for the proposition that "[c]ourts have commonly found mandamus appropriate under § 706 when delays stretch beyond three-to-six years, even where there is no statutory deadline for action." Pl.'s Reply at 21; *see Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 36 (D.D.C. 2000) (finding four-year delay unreasonable in absence of statutory deadline); *Democratic Senatorial Campaign Comm. v. FEC*, No. Civ.A. 95-0349 (JHG), 1996 WL 34301203, at *6 (D.D.C. Apr. 17, 1996) (finding two-year inaction contrary to law in absence of statutory deadline); *Sims v. Ellis*, 972 F. Supp. 2d 1196, 1206 (D. Idaho 2013) (finding six-year delay unreasonable in absence of statutory deadline); *Earth Island Inst. v. Regan*, 553 F. Supp. 3d 737, 749 (N.D. Cal. 2021) (finding six-year delay unreasonable in absence of statutory deadline). Defendants distinguish all of these cases as involving "a pending petition to which an agency failed to respond." Defs.' Reply at 18. The Court ultimately does not see this point of contention as particularly important to the present motions.

GMP . . . have been implemented or are in progress" and that the Park was prioritizing "common sense elements of the GMP").  If that is the case—and the Court struggles to locate any other justification for how slowly NPS has moved—NPS's delay hardly complies with any discernable rule of reason.  *See Pub. Citizen Health Rsch Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013, 1020 (D.D.C. 1989) ("Once an agency decides to take a particular action, a duty to do so within a reasonable time is created.").  Rather, the delay here is "primarily attributable to interagency conflict, not financial or personnel shortages.  Mandamus relief can't make money grow on trees, but it can end an interagency turf war."  *In re Pub. Emps. for Envtl. Resp.*, 957 F.3d at 274.  Accordingly, the first factor favors NPCA.

### b. The Third and Fifth TRAC Factors

"*TRAC's* third factor . . . overlaps with the fifth," *In re Barr Labs., Inc.*, 930 F.2d 72, 75–76 (D.C. Cir. 1991), so "courts tend to analyze them together," *Dahl v. Dickson*, No. 19-cv-3267 (ABJ), 2020 WL 6887925, at *6 (D.D.C. Nov. 24, 2020).  The third and fifth *TRAC* factors, taken together, favor NPCA.  Regarding the third factor, NPCA has not shown that NPS's "inaction risks life and limb."  *In re Pub. Emps. for Env't Resp.*, 957 F.3d at 274.  Nonetheless, the D.C. Circuit has found that the third factor is "at least neutral" when an agency's failure to regulate "harms visitor welfare to some extent by exposing visitors to unmitigated noise pollution."  *Id.*  Similarly, here the Marine Reserve Zone would "provide snorkelers and divers with the opportunity to experience a healthy, natural coral reef, with larger and more numerous tropical reef fish and an ecologically intact reef system."  AR_965.  These recreational activities "contribute to the health and personal fitness of park visitors," NPS Policies § 1.5, and a Marine Reserve Zone would also help ensure that such visitors are exploring an environment without "marine debris" such as fishing traps, nets, and line, and other "[c]ontaminants," AR_974;

AR_978 ("Marine debris adversely affects not only visitor experience.").  More indirectly, the record also contains evidence that healthy coral reefs provide protection from tropical storms and provide other benefits to human health and the environment.  AR_1409–10.

The fifth factor—the nature and extent of the interests prejudiced—heavily favors NPCA. The record contains abundant evidence that the Park's coral reefs are facing rapid decline. AR_1181; AR_1412; AR_1534; AR_1984.  As of 2015, only approximately 6% of the Park's reefs remained alive, and these surviving reefs "continue to be under duress."  AR_1980.  In addition to providing ecosystem services, these coral reefs carry tremendous importance to visitors as "cultural resources."  AR_2038.  Continued delay would have "long-term negative impact" on the Park's coral reefs and on visitors' experiences of the Park, AR_104; AR_125, in contradiction with NPS's mission to "conserve park resources and values," NPS Policies § 1.4.3. Defendants do not make any argument rebutting the importance of the coral reefs or disputing the voluminous record evidence of their poor condition—instead, Defendants say only that "it does not follow that moving Plaintiff's preferred management actions to the front of the line will render a net benefit" to the "coral and fish populations."  Defs.' Mot. at 34.  This flat statement is directly contradicted by NPS's conclusions on the Marine Reserve Zone's benefits, as repeatedly documented throughout this opinion.  Consequently, given the alarming nature and extent of the interests prejudiced here—the potential death of the Park's coral reefs—the fifth factor strongly weighs toward relief.

### c.  The Fourth TRAC Factor

"Only one *TRAC* factor—competing agency priorities—seems to favor" Defendants.  *In re Pub. Emps. for Env't Resp.*, 957 F.3d at 274.  As discussed when analyzing the first factor, Defendants have not made a compelling factual case for what other priorities prevent NPS from

pursuing the Marine Reserve Zone.  Nevertheless, the Court does not question that NPS has limited resources, and that NPS "is in a unique – and authoritative – position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Mashpee Wampanoag Tribal Council, Inc.*, 336 F.3d at 1101 (citation omitted).  Indeed, "respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  *In re Barr Labs, Inc.*, 930 F.2d at 74.  As they must, these principles give the Court pause on whether intervention is appropriate.

Still, this is not a case where granting relief would put the Marine Reserve Zone first in a list of priorities and "move[] all others back one space."  *Id.* at 75.  So far as the Court is aware, there is no queue or schedule of priorities here, nor is it clear how the Marine Reserve Zone would delay action on other aspects of the GMP.  Additionally, NPS has previously indicated that the Marine Reserve Zone is an important priority when it stated that a regulation should be promulgated as soon as practicable.  AR_1323.  Consequently, the Court finds that the fourth factor tilts toward Defendants, but only modestly.

### d. The Sixth TRAC Factor

Finally, the sixth *TRAC* factor explains that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80 (cleaned up).  NPCA does not allege that NPS has behaved in bad faith, Pl.'s Mot. at 37, so the parties agree that this factor is neutral.

### e. In Sum, the TRAC Factors Show Impermissible Delay

Taken together, the Court finds that the *TRAC* factors weigh in favor of NPCA's desired relief.  Nine years after NPS committed to promulgating a regulation to establish a Marine

Reserve Zone in the GMP ROD, it still has not promulgated a draft regulation.  In the meantime, the Park's coral reefs have continued to suffer from NPS's delay.  The Court holds that NPS cannot wait any longer.  Therefore, it will **GRANT** summary judgment for NPCA on its Section 706(1) claim concerning the Marine Reserve Zone.

### C.  NPCA Is Eligible for Attorneys' Fees

The Court finds that NPCA has shown that it is eligible for attorneys' fees related to its FOIA request.  However, NPCA has not argued that it is *entitled* to attorneys' fees, so the Court cannot award fees at the present juncture.

In FOIA cases, "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  FOIA's fee-shifting provision "naturally divides the attorney-fee inquiry into two prongs, which [the D.C. Circuit] has long described as fee 'eligibility' and fee 'entitlement.'"  *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (quoting *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 470 F.3d 363, 368–69 (D.C. Cir. 2006)).  Crucially, to prevail on a fee request, a FOIA plaintiff must demonstrate both eligibility and entitlement to the award.  *See McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 710 (D.C. Cir. 2014).  And, after establishing both prongs, the plaintiff must show that its fee calculation is reasonable.  *See Covington v. District of Columbia*, 57 F.3d 1101, 1107–08 (D.C. Cir. 1995).

For the eligibility prong, there are two ways a plaintiff can substantially prevail and become eligible for an award of fees under FOIA.  First, a plaintiff substantially prevails when it secures a "judicial order, or an enforceable written agreement or consent decree."  5 U.S.C. § 552(a)(4)(E)(ii)(I); *Campaign for Responsible Transplantation v. FDA*, 511 F.3d 187, 193

(D.C. Cir. 2007).  Second, a plaintiff substantially prevails when its suit causes a "voluntary or unilateral change in position by the agency."  5 U.S.C. § 552(a)(4)(E)(ii)(II).  This basis for prevailing is often referred to as the "catalyst theory."  *Davis v. U.S. Dep't of Just.*, 610 F.3d 750, 752 (D.C. Cir. 2010).

 "[T]he catalyst theory is available when the plaintiff demonstrates that the litigation caused the agency to change its position voluntarily and release requested records."  *Nat'l Sec. Couns. v. CIA*, No. 11-cv-0444 (BAH), 2017 WL 5633091, at *8 (D.D.C. Nov. 21, 2017).  "A plaintiff's recovery under the catalyst theory thus turns on causation."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 41 (D.D.C. 2016) (quotation marks and citation omitted).  "Causation requires more than correlation."  *Dorsen v. SEC*, 15 F. Supp. 3d 112, 118 (D.D.C. 2014).  The question is whether "the institution and prosecution of the litigation cause[d] the agency to release the documents obtained."  *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 97 (D.C. Cir. 2020) (alteration in original) (internal quotation marks and citation omitted).  Consequently, a plaintiff must show "it is more probable than not that the government would not have performed the desired act absent the lawsuit."  *Id.* (quoting *Pub. Citizen Health Res. Grp. v. Young*, 909 F.2d 546, 550 (D.C. Cir. 1990).

NPCA seeks fees solely under the catalyst theory; it did not receive relief through a judicial order.  *See* Pl.'s Mot. at 38–39 (invoking the catalyst theory).  Here, NPCA has established that it likely would not have received the documents at the time that it did if not for the litigation.

As an initial matter, is indisputable that to some extent the delay stemmed from the heavy workload of NPS's FOIA officer, Dr. Wilson.  NPCA's counsel, Arnold & Porter, made the FOIA request in spring 2020, during the early stages of the COVID-19 pandemic and amid a

surge of FOIA requests to NPS related to the protests surrounding the death of George Floyd.

*See* Wilson Decl. ¶ 10.  In addition to these unusual circumstances, at this time Dr. Wilson was

the only individual servicing both NPS's main FOIA office and its Washington officer.  *See id.*

Nonetheless, immediately after NPS received the request, it acknowledged it, assigned it a

tracking number, and indicated its place in the queue of requests.  *See* Pae Decl. ¶ 5.  Dr. Wilson

was processing the request in the normal course, and she was responsive to Arnold & Porter's

repeated inquiries about the FOIA request, explaining where the request fell in the processing

queue.  Wilson Decl. ¶¶ 6–8, 19.  At one point, Arnold & Porter did not respond to Dr. Wilson's

suggestion about how to narrow the pool of possibly responsive records, which she sent several

weeks before the lawsuit was filed.  *Id.* ¶ 19.  It would have been a wiser move for NPCA's

counsel to continue communicating with Dr. Wilson rather than going silent and then only

reopening discussions after the claim was filed.  *See, e.g.*, Pae Decl.  ¶¶ 8, 11 (describing Arnold

& Porter's conversations with NPS counsel, including an offer to narrow the FOIA request).

All that being so, the record still shows that NPCA's litigation moved NPS to prioritize

and fulfill NPCA's request.  "Indeed, an agency's 'sudden acceleration' in processing a FOIA

request may lead to the conclusion that the lawsuit substantially caused the agency's compliance

with FOIA."[11] *Elec. Priv. Info. Ctr.*, 218 F. Supp. 3d at 41 (quoting *Terris, Pravlik & Millian,*

*LLP v. Ctrs. for Medicare and Medicaid Servs.*, 794 F. Supp. 2d 29, 38 (D.D.C. 2011)).  Dr.

Wilson's declaration makes plain that the litigation influenced her processing of NPCA's

request.  In February 8, 2021, she "advised the DOI attorney assigned to this litigation that as of

---

[11] The D.C. Circuit has not directly spoken to whether such an acceleration theory can establish that a plaintiff substantially prevailed.  *Grand Canyon Tr.*, 947 F.3d at 97–98 ("We need not decide whether a 'sudden acceleration' of production can, of itself, represent a 'change in position' within the meaning of the statute.").

that date there were 2 expedited, 8 simple, and 61 normal requests ahead of this request."

Wilson Decl. ¶ 22.  Then, the following month:

> [I]n response to a status inquiry, [Dr. Wilson] advised the DOI attorney assigned
> to this matter that [she] had not yet been able to begin reviewing the potentially
> responsive records, as [she] had several other litigations ahead of this one in my
> processing queue.  However, [she] suggested that [she] could commit to
> reviewing 500 pages per month.

*Id*. ¶ 25.  Production ultimately began at the end of the month.  *Id.* ¶ 28.  By June 2011, Dr.

Wilson "advised the Assistant U.S. Attorney . . . assigned to this matter, that this request was

now first in [her] litigation processing queue."  *Id.* ¶ 30.

So while Dr. Wilson says that "this lawsuit was not the catalyst to Plaintiff's receipt of

records," the rest of her declaration indicates otherwise.  *Id.* ¶ 53.  While NPS may well have

eventually produced documents without litigation pressure, the evidence signals that the lawsuit

directly spurred an NPS commitment to review a certain number of pages per month, as well as

an initial release of records shortly thereafter.  Before the lawsuit, NPS had not previously

provided any "predictions as to when production would be completed" or any timeline at all,

only the number of how many other requests were ahead in the queue.  *Grand Canyon Tr.*, 947

F.3d at 97.  Without a doubt, the "presence of administrative delays and burdens" influenced

NPS's delay.  *Env't Def. Fund v. U.S. Env't Prot. Agency*, No. 17-cv-02220 (APM), 2022 WL

136792, at *4 (D.D.C. Jan. 13, 2022).  But it is more likely than not that "'the threat of an

adverse court order' was in fact the reason the agency responded or accelerated its response to

the complainant's FOIA request."  *Id.* (quoting *Church of Scientology of Cal. v. Harris*, 653 F.2d

584, 588 (D.C. Cir. 1981)).  Thus, NPCA has shown that it is eligible for FOIA attorneys' fees

and costs.

However, while NPCA may be *eligible* for FOIA fees, it has made no argument that it is

*entitled* to those fees under the second prong of the test.  *See McKinley,* 739 F.3d at 710 (stating

that plaintiffs must show both eligibility and entitlement).  Defendants emphasize this point,

contending that NPCA "has forfeited any argument to entitlement" and arguing that the Court

should deny summary judgment on that basis.  Defs.' Mot. at 41; *see also Performance*

*Contracting, Inc. v. Rapid Response Const., Inc.*, 267 F.R.D. 422, 425 (D.D.C. 2010) (noting a

party may not raise new arguments in a reply); *John C. Flood of Va., Inc., v. John C. Flood, Inc.*,

700 F. Supp. 2d 90, 96 n. 4 (D.D.C. 2010), *aff'd*, 642 F.3d 1105 (D.C. Cir. 2011) (rejecting

theories not raised in summary judgment motion).

     NPCA recognizes that it cannot receive attorneys' fees on the present motion, but

responds that entitlement is a "secondary issue in the analytical framework governing FOIA fees,

because the court can decide this issue, along with the issue of reasonableness of fees, after it

determines that NPCA has substantially prevailed."  Pl.'s Reply at 24.  NPCA does not provide

caselaw that specifically supports the position that parties tend to bring motions for FOIA fees in

this piecemeal fashion: the only case it cites merely reiterates that the attorney-fee inquiry has

two prongs. [12]  *See Vollmann v. Dep't of Just.*, No. 12-cv-0939 (FYP), 2022 WL 1124814, at \*5

(D.D.C. Apr. 14, 2022) (explaining that the issue of entitlement to a fee award is decided "[o]nce

a plaintiff is deemed eligible for a fee award").

     Nevertheless, a "party may move for summary judgment, identifying each claim or

defense — *or the part of each claim or defense* — on which summary judgment is sought."  Fed.

R. Civ. Pro. 56(a) (emphasis added).  Accordingly, "[u]nder the plain text of Rule 56(a), the

Court can enter summary judgment as to some, but not all, elements of a claim."  *Fed. Trade*

---

[12] As Defendants note, in *Vollman*, the "moving party addressed both eligibility and
entitlement in the same briefing, as well as included supporting documentation in support of his
claim that the amount of attorneys' fees and costs sought was reasonable."  Defs.' Reply at 23
(citing *Vollmann*, No. 12-cv-0939, ECF No. 37).

*Comm'n v. Surescripts, LLC*, 665 F. Supp. 3d 14, 37–38 (D.D.C. 2023) (cataloguing cases where other courts in this district have granted partial summary judgment on elements of a claim). Moreover, because the parties have sufficiently briefed the first prong of the attorneys' fees inquiry and the Court has reached a conclusion, there would be no efficiency in forcing the parties to relitigate that issue later on.  Thus, the Court will grant NPCA's motion for summary judgment on Count III to the extent that it has shown eligibility for attorneys' fees, and will deny Defendants' motion for summary judgment.

Finally, the Court observes that after this point, Fed. R. Civ. Pro. 54(d) and LCvR 54.2 provide the parties with the appropriate avenue for addressing fee awards.  The parties may address the second prong of the FOIA attorneys' fees inquiry, as well as any fees related to the substantive APA claim, in accordance with the timeline for fee petitions set out in those rules. *See* Fed. R. Civ. Pro. 54(d); LCvR 54.2.

## V.  CONCLUSION

For the foregoing reasons, NPCA's motion for summary judgment (ECF No. 41) is **GRANTED IN PART AND DENIED IN PART** and Defendants' cross-motion for summary judgment (ECF No. 42) is **GRANTED IN PART AND DENIED IN PART**.  Defendants shall publish a proposed special regulation to designate the Marine Reserve Zone as soon as practicable.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 29, 2024                                  RUDOLPH CONTRERAS
                                                        United States District Judge